IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 34230-1-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CRAIG SCOTT BURTON, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

FEARING, C.J. — Craig Burton wished to die. Because of his father's background in law enforcement and his own background in the military, Burton sought to commit suicide by cop. He successfully provoked police officers into shooting him, but not into killing him. Burton appeals on numerous grounds his convictions for assault on the officers. Because of the tragic circumstances that led to his suicide attempt, he also pleads that this court direct the trial court to reduce his lengthy sentence. Like the trial court, we empathize with Burton, but our empathy will ring hollow to him. We provide Burton no relief from his convictions and only limited relief to his sentence.

FACTS

The trial court convicted Craig Burton of three counts of second degree assault after a bench trial. We purloin the facts from the trial court's thirty-five pages of findings of fact and conclusions of law.

We start with some background of appellant Craig Burton. Burton's father served in the Air Force and as a police officer, sheriff, and corrections officer. Craig Burton learned police work from his father. He later joined the United States Army. Burton served on active duty for four years and two years in the National Guard. He received extensive weapons and de-escalation of hostility training.

Craig Burton suffers from attention deficit hyperactivity disorder (ADHD). To combat ADHD during military service, Burton took Adderall XR. The medication successfully managed the disorder's symptoms. When the Air Force honorably discharged Burton, it advanced him a ninety-day supply of Adderall.

After leaving the military, Craig Burton obtained employment as an intermediate care technician with the Spokane Veteran's Affairs (VA) hospital. Burton married Tiffany Shuskey, and the couple bore children. In January 2015 when the marriage soured, Burton cohabitated with girlfriend Rebecca "Becca" Libby. Clerk's Papers (CP) at 117.

The Spokane VA hospital treated Craig Burton for ADHD. After one VA physician lowered Burton's dosage for Adderall, Burton's ADHD symptoms returned,

2

and he requested an increase in the dosage. In February 2015, a VA physician declined to increase the Adderall prescription and instead prescribed Paxil, the trade name for Paroxetine. In March 2015, suicidal thoughts commenced to haunt Burton. When Burton told his physician about his suicidal ideation, the doctor counseled him to await the medication's effect. In late April 2015, Burton attempted suicide by overdosing on prescription medications. Becca Libby rushed Burton to a hospital emergency room.

After Craig Burton advised the VA hospital of his suicide attempt, a VA physician doubled Craig Burton's Paxil prescription. Burton's suicidal deliberations continued nonetheless.

The events leading to Craig Burton's prosecution for assault of police officers occurred on May 6, 2015. On that day, Burton felt overwhelmed by life's circumstances. His wife Tiffany Shuskey would soon finalize their divorce. Burton questioned his ability to afford child support, and he feared he may lose his home and vehicle. His relationship with girlfriend Becca Libby deteriorated.

As a result of desultory texts from Craig Burton during the early morning of May 6, Becca Libby visited Burton's residence and attempted to cheer him. Burton acted cold and withdrawn. Libby and Burton later went to their respective workplaces. During the workday, Burton and Libby exchanged text messages that increased Libby's alarm for Burton's welfare. After work, Libby sought advice, from her mother Karen Christopher, about quieting Burton. Libby and Christopher chose to visit Burton at his North Ash

3

Street, Spokane, home.

Ash Street functions as a major north-south arterial street in Spokane. Craig Burton's residence fronted the arterial, and his property included a back alley with a detached garage. The alley held an area for parking. An eight-foot high white vinyl privacy fence surrounded Burton's backyard.

At 8:00 p.m., on May 6, Karen Christopher and Becca Libby arrived at Craig Burton's Ash Street home. Christopher parked her car behind Burton's Suburban in the alley parking area. Christopher and Libby entered Burton's backyard and saw him sitting on his back porch. A beer rested on the steps next to Burton.

Becca Libby went inside Craig Burton's residence while Karen Christopher conversed with Burton in the backyard. Christopher found Burton quiet, and he appeared to have been sobbing. Christopher did not consider him intoxicated. Burton continuously muttered, "'Life is not fair,'" while referencing his divorce and the possible loss of his children, house, and truck. CP at 117. Burton repeatedly asked Christopher to "'call the police.'" CP at 118. When Burton reached for a beer, Christopher noticed a handgun. She did not deem Burton as a threat to her, but she worried that Burton was suicidal. Christopher asked him to hand her the gun. Burton refused.

Unbeknownst to others, Craig Burton schemed to commit suicide by cop. He believed that, if he engendered certain circumstances, experienced and skilled law enforcement officers would shoot and kill him. Burton had earlier loaded the gun that

4

rested on the back porch.

Karen Christopher entered the residence and told her daughter that Craig Burton possessed a gun. Christopher called 911 and reported Burton's behavior to a dispatch operator. Dispatch advised Christopher to leave the residence. Christopher complied, but Becca Libby remained in Burton's house. Becca Libby judged Burton as intoxicated and suicidal. Libby fleetingly exited to the porch, grabbed a clip of bullets, and hid the bullets in a purse.

At 10:00 p.m. on May 6, 2015, Spokane Police Officers Christopher Benesch, Sean Wheeler, and Adam Potter respectively answered dispatch's summons to Craig Burton's Ash Street residence to investigate an intoxicated, suicidal male with a gun. The three officers assembled in the alley behind and north of Burton's residence. Officer Potter carried a Colt AR 15 semi-automatic rifle and a ballistic shield. Officer Wheeler bore a beanbag gun, and Officer Benesch held a ballistic shield in one hand and his duty weapon in the other. Darkness, except for a lone spotlight, abounded in the alleyway. The officers formulated a plan to instigate a conversation with Craig Burton.

Spokane Officers Blaine Kakuda, Troy Teigen, John Arredondo, Joseph Matt, Yeshua Matthew, Jake Jensen, Nicholas Spolski, and Lieutenant Dean Sprague also arrived near the Ash Street residence and assembled in the alley to the south of Burton's home. Jensen wore a body camera that filmed the coming drama. The State would charge Craig Burton with assaulting Officers Christopher Benesch and Adam Potter, who

5

stood north of the alley, and Officer Jake Jensen, who stood south of the alley. Therefore, these three officers' fears loom important.

Craig Burton heard sirens, but saw no law enforcement officers in front of his home. He had expected that police would first knock on his door. He went to his backyard gate and noticed police in the alley north of his parked Suburban.

While still inside his gated backyard, Craig Burton fired three rounds from his pistol into neighborhood trees. Burton aimed into the trees so he would not hit an officer or a neighbor. He also did not want police to shoot neighbors or his dog, who rested inside his home.

Craig Burton assumed his shots would prompt law enforcement officers to retreat. All eleven assembled officers heard the pistol shots, but none could see Burton in the dark behind his backyard fence. Officer Christopher Benesch saw, over the fence, Burton's pistol and a muzzle flash. Officers Adam Potter, Sean Wheeler, Blaine Kakuda, and Joseph Matt believed Burton shot at them and feared for their and other officers' safety.

Some mustered law enforcement officers heard Craig Burton repeatedly yell: "'do it,'" "'just do it,'" or "'come do it.'" CP at 122, 124, 127-29. Burton fired more shots into the air to empty his magazine. He never intended to physically harm police officers and shot every round away from the officers. Burton judged that he frightened none of the officers. Officer Jake Jensen heard a total of eleven shots and feared being shot.

6

Jensen knew the shots originated from Burton's backyard, but could not identify the location of the shooter.

Craig Burton next dropped the ammunition magazine and engaged his gun's safety. Officers Potter, Wheeler, Benesch, and Matt heard, based on their training, a sound that resembled the reloading of a gun rather than engaging of a safety.

Craig Burton opened the backyard gate and, with his pistol pointed to the ground, stepped into the alley. He never aimed his weapon at law enforcement officers. He assumed officers would command him to drop his weapon, and, if he disobeyed, one or more would shoot him.

One of the officers standing in the south barked for Craig Burton to "'show me your hands, drop the gun, drop the gun.'" CP at 129. When Burton defied the command, the officer shot Burton once in the abdomen. Officer Christopher Benesch hurried to assist Burton, and an ambulance later transported Burton to the hospital. At the hospital, Officer Dale Wells spoke with Burton. Burton told Officer Wells that he wished police officers had killed him and he was glad he injured no one.

After the transport of Craig Burton to the hospital, investigating Spokane Police Department Detectives Michael Drapeau and James Dresback reviewed Craig Burton's residence property. The officers found multiple bullet casings in the backyard of and alley behind Burton's residence. They did not locate any bullet holes or strikes. Although many of Burton's neighbors heard the gunfire, none found damage to their

property. At trial, Detective Drapeau testified that, from the position where he located the bullet casings, Burton could view officers to the north of him but not officers to the south of him. Again, Officer Jake Jensen stood to the south of Burton.

Law enforcement jailed Craig Burton after Burton's hospital recovery. While resting in jail, Burton discontinued taking Paxil, and the fateful suicidal ruminations ceased.

PROCEDURE

The State of Washington charged Craig Burton with three counts of first degree assault under RCW 9A.36.011. To support the three charges, the State alleged Burton, with intent to inflict great bodily harm, intentionally assaulted Officers Adam Potter, Christopher Benesch, and Jake Jensen while on duty. We do not know why the State chose and only chose Officers Potter, Benesch, and Jensen as the victims. The prosecution holds discretion in charging decisions. We compliment the State for exercising its discretion in limiting the charges to no more than three officers.

The State accompanied each assault charge with a firearm sentence enhancement. Burton denied the charges and opted for a bench trial. The State requested the opportunity to alternatively convict Burton on the lesser included offense of second degree assault. Craig Burton never forwarded diminished capacity as a defense.

The trial court heard testimony from twenty-nine witnesses, including Craig Burton and Burton's expert witness, Dr. Matthew Layton. Craig Burton stated, during

8

his trial testimony:

> Q. Now, when you fired the shots to get the police to back up, was your intention to scare them away from the scene or what did you think their thought process was?
>
> A. Honestly, I didn't think they would have a thought process. I thought they would do what I would do, which is revert back to your training and react according to the situation. The situation at the time dictated that they retreat to cover and determine where the gunfire is coming from and in what direction that gunfire is going. And after I could see that they had left their first location and started moving further north in the alley, I sat for a minute and that's when I was like—*I was preparing to go out into the alleyway but before I did that, I did a few quick peeks to the south to see if there was anybody located there.* And I saw the officer's position behind this car (indicating) and I knew that the other officers were on the east side of the alley while these officers were on the west side of the alley, so I knew that when I stepped out into the alleyway I needed to remain—I needed to hug the west—or the east side of the alley so that gunfire didn't come anywhere near here and I knew they had cordoned off the block so there should be no traffic either way.

Report of Proceedings (RP) at 678-79 (emphasis added). Burton further declared:

> Q. You knew you were in trouble, Mr. Burton, correct?
>
> A. I can't explain my thought process. Everything that I did in the situation, from the time I saw the police, from that time forward, everything I did, the way I did it makes sense. The fact that I did it, doesn't make sense. Everything I did prior to that doesn't make sense to me. The fact that Karen [Christopher] reached for the gun and I didn't hand her the gun doesn't make sense to me. The fact that I would turn Becca away doesn't make sense to me. Under a clear mind with a clear head, not in some drug-induced whatever you want to call it, I would—none of this would have happened.
>
> Q. Okay. So you're sitting there. You're confused. You're—you know you're in trouble but you never call 911 for help, correct?
>
> A. Correct.
>
> Q. And when you see the officers, you assume that you have no opportunity to talk to them. Did you actually ask them for help?
>
> A. It's like a trigger went off in my head like I was no longer in a

civilian setting. I was—this was now a tactical environment.

Q. But you've never been diagnosed with posttraumatic stress disorder, have you?

A. That has nothing to do with reverting back to—

Q. Have you?

A. No.

RP at 705-06.

On cross-examination, Craig Burton answered:

A. Yes, sir.

Q. All right. Now, you testified that the officers responded perfectly according to what you predicted they would?

A. Yes.

Q. All right. That didn't scare you?

A. No. That's what I wanted. I wanted to die. Why would I be scared to get shot?

Q. Okay. But you didn't decide that you wanted to die immediately, correct?

A. No, not until I saw that formation I felt like they made my mind up for me, and that's when the trigger kind of went off, and I no longer felt like I was just sitting in my backyard. It was now a tactical environment.

Q. Okay.

A. I felt like I was—I was the defender from aggressors, in a sense. My sole purpose from that point forward, like I said, I felt like my mind was made up for me. I felt like they made my mind up for me. I was going to get shot. At that point it was my responsibility to make sure that that happened in the safest way possible and I know that doesn't make a lot of sense.

Like I said, the way I did things makes sense to me. The fact that I did them makes absolutely no sense. I don't know why I did what I did, but I do know that the actions I took were specifically taken to ensure that I was killed in the safest fashion possible.

Q. Were you scared?

A. No. I was scared for the people I cared about. I was scared about my neighbors. I was scared that if the police had shot at me where I was standing a bullet could have gone somewhere and hurt somebody. I was scared for the people around me but I was not scared for my own

person.

. . . .

Q. You intended to be killed, correct?

A. Yes.

Q. All you had to do then, based upon your own knowledge and training, was to walk out into that alley with a pistol and turn and they would have shot you, correct?

A. Again, I would not point my weapon at a police officer so that was not an option.

Q. That wasn't the question, Mr. Burton. The question was you knew—

A. Yes.

Q. —if you did that, they would shoot you, correct?

A. Yes, if I did that I most likely would have been shot.

. . . .

Q. Mr. Burton, you testified that you fired the shots to force them to retreat, correct?

A. Right, to move them back.

RP at 713, 715-16.

Dr. Matthew Layton, a board certified psychiatrist with a doctorate in pharmacology, testified regarding the possible impact of Burton's medication on Burton's actions. Layton noted that Paxil contains a black box warning that advises that the medication may cause suicidal ideation in some patients. The warning recommends that a patient immediately report to a physician if the patient experiences suicidal thoughts. A black box warning appears on the prescription package insert and acquires its name from the United States Food and Drug Administration (FDA) rule that demands a black border around the text. The black box warning constitutes the strongest warning that the FDA requires and signifies that medical studies indicate that the drug carries a

11

No. 34230-1-III
*State v. Burton*

significant risk of serious or even life-threatening adverse effects.

Dr. Matthew Layton testified that Craig Burton's suicide attempts were consistent with his use of Paxil. Layton emphasized that Burton's suicidal ideation ceased when he ended taking Paxil in jail. Dr. Layton declared that a patient should not consume alcohol while taking Paxil and that a patient using the drug may display disinhibition, impulsivity, weight loss, insomnia, and paranoia.

The trial court convicted Craig Burton of three counts of second degree assault under RCW 9A.36.021 and found that Burton performed each count while armed with a firearm. In the court's extensive findings and conclusions, it wrote:

> 90. Officer Jensen testified the situation was extremely dangerous and highly dynamic. It was dark and the backyard where the unknown male was located was enclosed by a vinyl privacy fence. Officer Jensen heard three shots and then additional shots followed. He heard a voice yell "come do it."
> 91. Officer Jensen testified he had his ballistic shield, service revolver, and non lethal beanbag rifle with him. He heard more shots fired for an eventual total of 11 shots.
> 92. Officer Jensen testified he was scared of being shot and that officers could not specifically identify the threat and where it was coming from.
> 93. Officer Jensen testified he could not tell where the shots fired were directed or aimed . . . only that he could tell the shots were coming from the backyard of 5527 North Ash.

CP at 129 (alteration in original). The trial court entered the following conclusions of law:

> 28. Here, Officers Potter, Benesch, and Jensen all testified that they were fearful of being shot by the Defendant and could not tell where the

12

No. 34230-1-III
*State v. Burton*

Defendant was and what he may have been specifically shooting at. However, the focus, pursuant to WPIC 35.50 is not solely directed towards the question of whether officers were in apprehension or fear of bodily injury. (All testified they clearly were.) The analysis must also inquire as to whether the actor (in this case, Mr. Craig Burton) intended to create in the named law enforcement officers apprehension and fear of bodily injury.

29. Here, the facts clearly demonstrate beyond a reasonable doubt that, while the Defendant, Mr. Craig Burton did not intend to inflict great bodily harm on law enforcement officers, he did in fact intend to create in those same law enforcement officers reasonable apprehension and imminent fear of bodily injury.

30. Indeed, Mr. Burton's own testimony was illustrative regarding his intentions on May 6, 2015. While Mr. Burton did not intend to inflict great bodily injury upon the officers, he nevertheless planned and carried out a confrontation with law enforcement that was clearly designed to impose upon those law enforcement officers apprehension and fear, which would cause them to then shoot Mr. Burton and kill him.

31. It goes without saying, even in a highly trained and skilled law enforcement officer or member of the military, an unknown individual firing 11 shots in the dark, in close proximity to your person, is going to cause apprehension and fear. Mr. Burton knew and understood that by creating apprehension and fear in officers, they would then hopefully fall back upon their training and experience and shoot him. Indeed, Mr. Burton testified that his plan "went off to a T." Whether Mr. Burton was aware of it or not, his intention in imposing apprehension and imminent fear of bodily injury upon law enforcement officers was an action that directly constitutes assault in the second degree.

CP at 143-44.

Craig Burton sought reconsideration of the third count charging him of assault of Officer Jake Jensen. He argued that, since he never saw or knew of Officer Jensen's presence, he lacked the requisite intent for assault. The trial court denied the motion for reconsideration.

13

Craig Burton requested an exceptional sentence based on RCW 9.94A.535(1)(e), which applies when the defendant suffers from an impaired capacity to appreciate the wrongfulness of his conduct or to conform his conduct to lawful requirements. Burton asked that the exceptional sentence include zero days on the base sentence for assault and no more than two months for each firearm enhancement.

The trial court sentenced Craig Burton at the bottom of the standard range for a first-time offender by ordering concurrent fifteen months' confinement on each assault. In addition, the trial court imposed the mandatory thirty-six-month firearm enhancement for each count, with each sentence running consecutively. In total, the trial court sentenced Craig Burton to 123 months of prison time and eighteen months of community custody. During sentencing the trial court sympathetically and lamentedly remarked:

> I don't think going to prison is going to rehabilitate Mr. Burton. Rehabilitate him so he won't do what? He doesn't need rehabilitation. I don't think it's going to protect society because I'm not satisfied that society is necessarily at risk with Mr. Burton in the community. If he's back in the community, well, putting that aside, it just strikes the Court when I'm in a situation like this that it's a significant waste of the taxpayer's resources for a gentleman like Mr. Burton to be incarcerated for years. But until the legislature sees fit to grant to judges discretion to craft an appropriate sentence, the Court's hands are tied.
> . . . .
> Now, here Mr. Burton has requested that the Court provide for an exceptional sentence downward. *What is problematic with that request is that the mitigating factors that Mr. Burton references, all which the Court frankly absolutely agrees with, but nevertheless they are already contemplated within the [Sentencing Reform Act (SRA)].* And sentencing judges, as counsel may be aware, and as I discovered again in my research independently, have consistently been reversed in this state when they

14

impose an exceptional sentence downward, or frankly it could be upward, but here, downward for factors that are already included in the standard sentencing range.

Some of the arguments consistently advanced that you read about in case law in this state are deviate downward for lack of criminal history or low risk to reoffend or protection of the public is not necessary or a defendant's clear concern for others that was displayed throughout the trial, all clear mitigating factors. But these are all things applicable to Mr. Burton, which are already inclusive in the SRA, and there are a number of cases that have pointed this out over and over in the [*State v. Pasal*, 108 Wn.2d 125, 736 P.2d 1065 (1987)] case, [*State v. Fowler*, 145 Wn.2d 400, 38 P.3d 335 (2002)] case, [*State v. Freitag*, 127 Wn.2d 141, 896 P.2d 1254 1995)] case are examples of what happens when a court sidelines the mitigating factors already built into the SRA and decides to deviate downwards, frankly because they're looking for an opportunity to accomplish an end result that they think fits.

*I'm confident I don't have any reasonable basis that's been offered to mitigate below the standard range.* I just don't have that in front of me. And doing so, I am confident would be absolute reversible error by the Court. So putting that aside for a minute, turning to the issue of the firearm enhancement, I've said this before, I'm going to say it again, I am very saddened by this situation that Mr. Burton finds himself in and I return to my earlier comments that not only am I saddened, I'm incredibly frustrated by a mandatory firearm enhancement in the State of Washington that I have no ability to deviate from.

RP at 900, 902-03 (emphasis added).

## LAW AND ANALYSIS

### Convictions

Craig Burton requests this court reverse his three convictions, and, if not, reduce his sentence. In sum, he argues that the State failed to prove any of the three counts of second degree assault because the State failed to show an intent to inflict fear or apprehension in any law enforcement officer, an element of second degree assault. He

15

further contends that, at the least, the State's evidence unsuccessfully showed any intent to harm Officer Jake Jensen, one of the officers standing in the south of the alley. If we do not accept his argument that the State failed to sustain all three charges, he seeks a new trial on the basis of ineffective assistance of counsel for failure to present a diminished capacity defense. We later outline his assignments of error regarding his sentence. Burton's numerous, but legitimate, arguments prolong our opinion.

*Issue 1: Whether the State presented sufficient evidence to convict Craig Burton of any of the three charges for second degree assault?*

*Answer 1: Yes.*

Craig Burton contends the trial court erred in convicting him of second degree assault because the State failed to prove he had the specific intent to create a fear of bodily injury in any of the victims when he harmlessly fired his weapon. We agree that Burton did not physically injure anyone, but we disagree that he intended no fear of harm.

We recite familiar principles of appellate review of evidence in a criminal prosecution. The State must prove every element of the crime charged beyond a reasonable doubt. CONST. art. I, § 3; U.S. CONST. amend. XIV; *In re Winship*, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970). Evidence suffices if a rational trier of fact could find each element of the crime beyond a reasonable doubt. *State v. Green*, 94 Wn.2d 216, 221-22, 616 P.2d 628 (1980). Both direct and indirect evidence may support

16

a verdict. *State v. Brooks*, 45 Wn. App. 824, 826, 727 P.2d 988 (1986). This court draws all reasonable inferences in favor of the State. *State v. Partin*, 88 Wn.2d 899, 906-07, 567 P.2d 1136 (1977). Nevertheless, inferences based on circumstantial evidence must be reasonable and cannot be based on speculation. *State v. Vasquez*, 178 Wn.2d 1, 16, 309 P.3d 318 (2013). Only the trier of fact weighs the evidence and judges the credibility of witnesses. *State v. Carver*, 113 Wn.2d 591, 604, 781 P.2d 1308, 789 P.2d 306 (1990).

RCW 9A.36.021 defines the crime of second degree assault. The statute reads, in relevant part:

> (1) A person is guilty of assault in the second degree if he or she, under circumstances not amounting to assault in the first degree:
> (a) Intentionally assaults another and thereby recklessly inflicts substantial bodily harm; or
> . . . .
> (c) Assaults another with a deadly weapon; or
> . . . .
> (e) With intent to commit a felony, assaults another.

Craig Burton's shots caused no one bodily harm. The State relies solely on subsection (c) since Burton employed a deadly weapon.

None of the assault statutes define "assault." Thus, courts resort to the common law definition of the statutory term. *State v. Byrd*, 125 Wn.2d 707, 712, 887 P.2d 396 (1995). Washington recognizes three definitions of assault: (1) an unlawful touching (actual battery), (2) an attempt with unlawful force to inflict bodily injury upon another, tending but failing to accomplish it (attempted battery), and (3) putting another in

17

apprehension of harm. *State v. Elmi*, 166 Wn.2d 209, 215, 207 P.3d 439 (2009). The State only relies on the third definition.

Assault by an attempt to cause fear and apprehension of injury requires proof that, with intent to cause a reasonable apprehension of immediate bodily harm, though not to inflict such harm, the accused performs some act that causes such apprehension. *State v. Byrd*, 125 Wn.2d at 713. The accused must actually intend to cause apprehension or to cause bodily harm. *State v. Byrd*, 125 Wn.2d at 713. Thus, specific intent is an essential element of assault in the second degree. *State v. Byrd*, 125 Wn.2d at 713. Specific intent means intent to produce a specific result, as opposed to intent to perform the physical act that produces the result. *State v. Elmi*, 166 Wn.2d at 215. Therefore, the State needed to prove that Craig Burton intended to cause reasonable fear and apprehension in each of the three alleged victims, Officers Adam Potter, Christopher Benesch, and Jake Jensen. We now address the three victims in general and later focus on the unique circumstances involving Officer Jensen.

Craig Burton asserts that the evidence failed to show he acted with the specific intent to cause officers to reasonably fear injury. He maintains that the evidence showed he fired a volley of shots to encourage officers to follow their training and retreat. By encouraging their retreat, he could better orchestrate his suicide attempt without endangering anyone else. Then he fired his remaining bullets to unload his pistol.

18

No. 34230-1-III
*State v. Burton*

The natural extension of Craig Burton's contention defeats his argument. Law enforcement officers receive training to respond with deadly force when they or some third person fear death or grievous injury. If Burton wanted to commit suicide by cop, he needed to engender fear and apprehension of harm in the officers. Therefore, we hold that the trial court, based on substantial evidence, correctly concluded that Burton knew and understood that, by creating apprehension and fear in officers, they would fall back on their training and experience and shoot him. This finding supports the conclusion that Burton specifically intended to create fear and apprehension and committed the crime of second degree assault.

To support his argument that his conduct did not establish second degree assault, Craig Burton compares his actions to the unlawful display of a gun and the harmless discharge of a gun in a public place, both of which are only misdemeanor offenses. Both examples, however, fall short of an apt analogy. Burton did not merely display a gun. He fired shots from the cover of dark without warning police that they were not his targets. Many officers surmised that Burton shot at them, and the trial court judiciously found that Burton wished the officers to fear injury.

*Issue 2: Whether the State presented sufficient evidence to convict Craig Burton of assaulting Officer Jake Jensen?*

*Answer 2: Yes, under the concept of transferred intent.*

19

Craig Burton presented testimony that he did not know any officers approached from the south in the alleyway and that Officer Jake Jensen, one of the three alleged victims, approached from the south. Craig Burton therefore argues that insufficient evidence supported his alleged assault on Officer Jake Jensen because he knew not of the presence of Jensen when he fired his pistol. According to Burton, the State could not establish specific intent to cause fear in Jensen. In response, the State argues both the facts and the law. The State first claims that some evidence supported a finding that Burton knew of officers in the south.

We agree with Craig Burton that the undisputed evidence established that Burton knew not of Officer Jake Jensen's presence when he intended to cause fear in officers to the north. An examination of the trial testimony confirms Burton's factual contention. Burton testified that, as he prepared to enter the alleyway, he looked to the south and saw no one. Detective Drapeau collaborated Burton's account. Detective Drapeau testified that, from the position where he located the bullet casings, Burton could see officers to the north, but not officers to the south. In his testimony, Burton acknowledged knowing that police cordoned off the block, but this testimony only demonstrated his general knowledge of officers in the area and not specific knowledge of any officer to the south. Even if we view the evidence in the light most favorable to the State, no evidence supports a finding that Burton knew of the presence of Officer Jensen before or during the discharge of his firearm. The trial court never found that Burton knew of the

20

No. 34230-1-III
*State v. Burton*

presence of Jensen. The absence of a finding on a material fact in effect is a finding that no such fact exists. *McCutcheon v. Brownfield*, 2 Wn. App. 348, 356, 467 P.2d 868 (1970).

The State also contends that the intent to create fear in the officers to the north was sufficient to sustain a conviction for all other officers at the scene, including those to the south. Burton denies that transferred intent applies to second degree assault based on the creation of an apprehension or fear of bodily injury. We agree with the State.

To obtain convictions for second degree assault, the State was required to prove Craig Burton committed assault by apprehension with a deadly weapon. Assault by apprehension has two elements: (1) intent to create apprehension and fear of bodily injury in another person, and (2) the creation of reasonable apprehension and imminent fear in fact in a specific person. *State v. Toscano*, 166 Wn. App. 546, 551, 271 P.3d 912 (2012). The defendant's intent is relevant to the first element, but not the second. Therefore, if the defendant intends to create a fear of apprehension of harm in *someone*, anyone who actually suffers a reasonable fear of harm by virtue of the defendant's actions qualifies as a victim.

The concept of transferred intent inheres in the very elements of assault by apprehension. Once the State establishes the defendant's specific intent to create an apprehension and fear of bodily injury, he or she may be prosecuted for the psychological harm caused to any victims, intended or not. Although, in our reported decisions, the

21

State has often limited assault by apprehension prosecutions to intended victims, it need not do so.

Craig Burton advances *State v. Abuan*, 161 Wn. App. 135, 257 P.3d 1 (2011), to support his contention that the State may not establish specific intent by transferred intent in a prosecution for second degree assault. We find *State v. Abuan* problematic for many reasons.

In *State v. Abuan*, the State alleged Kevin Abuan fired multiple shots at an occupied garage while passing in a vehicle. Three individuals were in the garage with the garage door open and one person, Fomai Leoso, inside the adjoining house. The State charged Abuan with, among other crimes, second degree assault of one of the individuals in the garage and of Leoso. The jury convicted Abuan on both assault charges. On appeal, the State advanced the theory of transferred intent from a person in the garage to Leoso. This court reversed Abuan's conviction for the assault of Leoso.

We decline to follow *State v. Abuan* for several reasons. First, in analyzing the issue of transferred intent for a second degree assault, the *Abuan* court observed that the State never offered an instruction on transferred intent. Therefore, the court observed under the law of the case that "there is no room for a transferred intent analysis without a transferred intent jury instruction." 161 Wn. App. at 156. Although the *Abuan* court later addressed transferred intent, the court should have declined to entertain the State's theory, and we could consider any analysis as dicta. Second, the State never presented

22

testimony from Fomai Leoso that Leoso feared harm from the shots fired by Abuan. The State presented testimony that Jake Jensen feared injury as a result of Craig Burton's discharges. Third, although the *Abuan* court did not wish to extend transferred intent to second degree assault, the court also held that Leoso, because of his position inside the house, "could not have been placed in reasonable apprehension and imminent fear of bodily injury." 161 Wn. App. at 154. Craig Burton's trial court, based on substantial evidence, found that Burton's shots placed Officer Jensen in reasonable apprehension and imminent fear of bodily injury.

The *Abuan* court reasonably worried about an accused being charged with unlimited counts of assault when the accused fires a shot intended to scare only one victim, but the shot caused apprehension in a throng of bystanders or gaggle of neighbors. We trust the requirement that a victim's apprehension of harm be reasonable, coupled with a fair exercise of prosecutorial discretion, will prevent such an outcome.

*Issue 3: Whether Craig Burton received ineffective assistance of counsel when his trial counsel did not present a diminished capacity defense?*

*Answer 3: No.*

Since we conclude sufficient evidence supports Craig Burton's three convictions, we must address whether Burton should receive a new trial. Burton contends the evidence and law supported a diminished capacity defense and his counsel performed deficiently by failing to raise the defense. He further asserts that the judge would have

23

acquitted him if his counsel raised the defense especially because his specific intent surfaced as the central issue in the prosecution. The State responds that Burton's trial counsel performed adequately because no evidence supported the theory that Burton's suicidality and medication affected his ability to form the intent necessary to commit second degree assault. We agree with the State.

The Sixth Amendment to the United States Constitution guarantees defendants the right to legal counsel in criminal trials. Like the federal constitution, Washington's Constitution also grants an accused, in a criminal prosecution, the right to appear by counsel. CONST. art. I, § 22. Washington's protections are coextensive with their federal counterpart.

To meaningfully protect an accused's right to counsel, the United States Supreme Court held an accused is entitled to "effective assistance of counsel." *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). An accused is entitled to more than an attorney sitting next to him at counsel table. Under *Strickland*, courts apply a two-pronged test: whether (1) counsel's performance failed to meet a standard of reasonableness, and (2) actual prejudice resulted from counsel's failures. *Strickland*, 466 U.S. at 690-92. To prevail on his or her claim, a defendant must satisfy both prongs of the ineffective assistance of counsel test. *State v. Hendrickson*, 129 Wn.2d 61, 78, 917 P.2d 563 (1996). If a defendant fails to establish one prong of the test,

24

this court need not address the remaining prong. *State v. Hendrickson*, 129 Wn.2d at 78. We address only the performance prong.

To satisfy the first prong, the defendant must show that, after considering all the circumstances, counsel's performance fell below an objective standard of reasonableness. *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). The burden is on the defendant to show deficient performance. *State v. Grier*, 171 Wn.2d 17, 33, 246 P.3d 1260 (2011). This court starts with the strong presumption that counsel's representation was effective. *State v. Studd*, 137 Wn.2d 533, 551, 973 P.2d 1049 (1999).

Washington does not punish defendants with a diminished capacity that precludes the formation of the crime's identified intent. *State v. Eaton*, 168 Wn.2d 476, 482 n.2, 229 P.3d 704 (2010). An accused may utilize diminished capacity when substantial evidence reasonably connects the defendant's alleged mental condition with the inability to possess the required level of culpability to commit the crime charged. *State v. Cienfuegos*, 144 Wn.2d 222, 227, 25 P.3d 1011 (2001). The trier of fact may consider evidence of a mental illness or disorder when determining whether the defendant had the capacity to form specific intent. *State v. Cienfuegos*, 144 Wn.2d at 227.

No case directly addresses ineffective assistance of counsel for failure to raise a diminished capacity defense during a bench trial. Two jury cases focus, in part, on counsel's failure to request a diminished capacity jury instruction. *State v. Cienfuegos*, 144 Wn.2d 222 (2001); *State v. Thomas*, 109 Wn.2d 222, 228, 743 P.2d 816 (1987).

25

Under this and other settings, the question of ineffective assistance of counsel does not lend itself to per se rules, but requires a case by case analysis. *State v. Cienfuegos*, 144 Wn.2d at 229. The failure to request a diminished capacity instruction is not ineffective assistance of counsel per se. *State v. Cienfuegos*, 144 Wn.2d at 229.

As we have already discussed, the State, to prove second degree assault, needed to show that Craig Burton, by use of a deadly weapon, intended to cause fear and apprehension of immediate bodily harm. We hold that defense counsel did not perform inadequately because the overwhelming evidence, if not undisputed evidence, established that Burton intended to cause fear in the law enforcement officers. Although Burton suffered from suicidal ideation and perhaps intoxication, no expert opined that either condition interfered in his ability to form an intent to cause fear in the police officers. Therefore, the evidence did not support a diminished capacity defense.

Craig Burton testified that, if he possessed a clear mind and had not entered a drug induced state of mind, the shootings would not have transpired. Nevertheless, this argument holds no relevance as to whether he could form the intent to frighten others. Burton also testified that he wished to commit suicide and the steps he took advanced this wish. We might debate whether suicide is an irrational act, but, in light of Burton's goal, he rationally planned to trigger his death by planting fear in the minds of law enforcement officers. Burton confirmed that he intended for the officers to retreat. No evidence supported a finding that he could not form this intent. Dr. Matthew Layton

26

testified that Craig Burton's suicide attempts were consistent with use of Paxil. Nevertheless, Layton never testified that the medication or alcohol prevented Burton from forming the intent to affect apprehension of immediate bodily harm in the minds of the police officers.

Craig Burton advances *State v. Thomas*, in which the Washington Supreme Court found trial counsel performed deficiently by failing to request a diminished capacity instruction when the defendant committed felony flight while intoxicated. Nevertheless, evidence supported extreme intoxication and possible blackouts. Thus, the jury could have concluded that the extreme intoxication negated the required wantonness or willfulness mental state for the crime. The lack of a diminished capacity instruction allowed the prosecutor to argue that Thomas' drunkenness caused her mental state and her reckless driving. In response, defense counsel argued that Thomas' drunkenness negated any guilty mental state. Nevertheless, counsel never proposed an instruction supporting the defense. We perceive *Thomas* as inapposite because of the differences in the evidence supporting diminished capacity.

Defense counsel's withholding of a diminished capacity defense strategically benefited Craig Burton in addition to being reasonable. The State charged Burton with first degree assault. By introducing evidence that Burton carefully planned not to harm law enforcement officers, Burton and his counsel successfully defeated the first degree assault charges. By employing this effective tactic, counsel eliminated the possibility of

27

a diminished capacity defense. Careful planning and diminished capacity do not coexist.

Sentencing

We move to the assignments of error raised by Craig Burton as to his sentence.

First, Burton requests resentencing because the firearm enhancements purportedly, as

applied to him, violate his equal protection rights. Second, Burton contends the trial

court erred in denying his request for an exceptional sentence because the trial court

believed it lacked authority to impose an exceptional sentence. Third, Burton asks this

court to find his sentence of ten years to be unconstitutionally cruel punishment.

*Issue 4: Should this court address the merits of Craig Burton's "as applied" equal*

*protection challenge to the imposition of firearm enhancements to his sentence when he*

*omitted the challenge before the trial court?*

*Answer 4: No.*

The trial court added a firearm enhancement to each of Craig Burton's convictions

for second degree assault. Burton contends the enhancements violated his constitutional

rights to equal protection.

RCW 9.94A.533(3)(f), which creates the enhancements, declares:

> The firearm enhancements in this section shall apply to all felony
> crimes except the following: Possession of a machine gun, possessing a
> stolen firearm, *drive-by shooting*, theft of a firearm, unlawful possession of
> a firearm in the first and second degree, and use of a machine gun in a
> felony.

(Emphasis added.) Craig Burton complains that RCW 9.94A.533(3)(f) exempts drive-by

28

shootings but not second degree assaults despite his conduct of shooting against trees creating less of a danger and the crime of second degree assault by creating fear in another being less morally culpable. Burton claims no legitimate reason supports the legislature's exempting drive-by shooting from firearm enhancements but not his second degree assault convictions.

The State observes that Craig Burton omitted any equal protection argument before the trial court. The State asks that we therefore ignore the merits of Burton's equal protection argument. We agree and hold that Burton did not preserve the claimed error for appeal and the assigned error does not fit the manifest constitutional error exception.

RAP 2.5(a) formalizes a fundamental principle of appellate review. The first sentence of the rule reads:

**Errors Raised for First Time on Review.** The appellate court may refuse to review any claim of error which was not raised in the trial court.

No procedural principle is more familiar than that a constitutional right, or a right of any other sort, may be forfeited by the failure to timely assert the right before a tribunal having jurisdiction to determine it. *United States v. Olano*, 507 U.S. 725, 731, 113 S. Ct. 1770, 123 L. Ed. 2d 508 (1993). The prerequisite affords the trial court an opportunity to rule correctly on an issue before it can be presented on appeal. *State v. Strine*, 176 Wn.2d 742, 749, 293 P.3d 1177 (2013).

29

RAP 2.5(a) contains a number of exceptions. RAP 2.5(a) allows an appellant to raise for the first time "manifest error affecting a constitutional right." Constitutional errors are treated specially under RAP 2.5(a) because they often result in serious injustice and may adversely affect public perceptions of the fairness and integrity of judicial proceedings. *State v. Scott*, 110 Wn.2d 682, 686-87, 757 P.2d 492 (1998). Nevertheless, permitting *every possible* constitutional error to be raised for the first time on appeal undermines the trial process, generates unnecessary appeals, creates undesirable retrials, and wastes resources. *State v. Lynn*, 67 Wn. App. 339, 344, 835 P.2d 251 (1992).

Craig Burton's equal protection argument implicates a constitutional right. Thus, we must judge if the argument addresses manifest error. Washington courts and even decisions internally have announced differing formulations for "manifest error." For purposes of Burton's appeal, we apply the rule that the assigned error must truly be one of constitutional magnitude. *State v. Scott*, 110 Wn.2d at 688. The constitutional violation must patently appear.

To determine whether Craig Burton's assignment of error implicates a manifest constitutional error we must briefly peruse the merits of the assignment. Washington Constitution article I, section 12, and the Fourteenth Amendment to the United States Constitution guarantee that persons similarly situated with respect to the legitimate purpose of the law must receive like treatment. Equal protection does not require that the government treat all persons identically, but that a distinction made in law bear some

relevance to the purpose behind the classification. *In re Detention of Dydasco*, 135 Wn.2d 943, 951, 959 P.2d 1111 (1998).

We compare the elements of the respective crimes of second degree assault and drive-by shooting. To repeat, Craig Burton's crime involved creating reasonable fear and apprehension of immediate bodily harm in another through use of a deadly weapon. RCW 9A.36.021; *State v. Byrd*, 125 Wn.2d at 712 (1995). The drive-by shooting statute, RCW 9A.36.045(1), declares:

> A person is guilty of drive-by shooting when he or she recklessly discharges a firearm as defined in RCW 9.41.010 in a manner *which creates a substantial risk of death or serious physical injury* to another person and the discharge is either from a motor vehicle or from the immediate area of a motor vehicle that was used to transport the shooter or the firearm, or both, to the scene of the discharge.

(Emphasis added.) The elements of the latter crime include (1) discharging a firearm, (2) from a motor vehicle or the immediate area of a motor vehicle that transported the discharger, and (3) creating a substantial risk of death or serious injury to another.

The crime of drive-by shooting necessarily requires use of a firearm, whereas assault does not. All crimes exempted from the firearm enhancement entail use of a firearm, which justifies the exclusion of the offenses enumerated in RCW 9.94A.533(3). The firearm enhancement statute would redundantly impose a firearm enhancement on a crime that necessarily includes the use of a firearm. The purpose of the initiative was to punish armed offenders more harshly to discourage the use of firearms. *State v. Berrier*,

31

110 Wn. App. 639, 649-50, 41 P.3d 1198 (2002). The crime, under which the trial court convicted Craig Burton, required a deadly weapon, but not a firearm.

Craig Burton cites no authority to support a conclusion that distinguishing between second degree assault when use of a gun creates fear and apprehension in others and a drive-by shooting lacks any rational basis. The lack of authority alone bolsters a conclusion that Burton's assignment does not rise to manifest constitutional error.

Craig Burton advances *State v. Berrier*, 110 Wn. App. 639, which also involved an equal protection challenge similar to RCW 9.94A.533(3). Nevertheless, the trial court convicted Shannon Berrier of possession of a short-barreled shotgun. This court held that none of the legislature's purposes were furthered by differentiating between short-barreled shotgun possessors and machine gun possessors. Possession of a short-barreled shotgun and possession of a machine gun are both criminalized under the same statute, RCW 9.41.190(1). Again, the statutory elements of second degree assault do not require possession of a firearm.

*Issue 5: Whether the trial court had authority to grant an exceptional sentence by modifying the length of the firearm enhancements?*

*Answer 5: No.*

Craig Burton contends the trial court erred in denying his request for an exceptional sentence for two reasons. First, he contends the trial court erred when not allowing a reduction in the firearm enhancements. Second, the trial court erred when

32

concluding it lacked authority to impose an exceptional sentence with regard to the

portion of the sentence attributed to the second degree assault convictions. We address

the two assignments of error in such order. We observe that the firearm enhancements

contributed disproportionately to Burton's lengthy sentence. The trial court's sentence

imposed nine years for the firearm enhancements. The sentence imposed one year and

three months for the second degree assault convictions. The enhancements nearly

subsume the sentence.

Craig Burton requested the trial court grant an exceptional sentence so that he

served no more than two months on each of his three firearm enhancements. The court

denied the request on the ground that it lacked discretion to modify the confinement

imposed from a firearm enhancement. Burton assigns error to the trial court's ruling.

The State responds that the Washington Supreme Court previously addressed this issue

and rejected Burton's argument. We agree with the State.

Under the firearm enhancements statute, RCW 9.94A.533, a defendant receives

three years of additional incarceration for each qualifying conviction. The statute

declares:

> (3) The following additional times shall be added to the standard
> sentence range for felony crimes committed after July 23, 1995, if the
> offender or an accomplice was armed with a firearm as defined in RCW
> 9.41.010 and the offender is being sentenced for one of the crimes listed in
> this subsection as eligible for any firearm enhancements based on the
> classification of the completed felony crime. If the offender is being
> sentenced for more than one offense, the firearm enhancement or

enhancements must be added to the total period of confinement for all offenses, regardless of which underlying offense is subject to a firearm enhancement. . . .

. . . .

(b) Three years for any felony defined under any law as a class B felony or with a statutory maximum sentence of ten years, or both, and not covered under (f) of this subsection;

. . . .

(e) Notwithstanding any other provision of law, *all firearm enhancements under this section are mandatory, shall be served in total confinement, and shall run consecutively to all other sentencing provisions, including other firearm or deadly weapon enhancements, for all offenses sentenced under this chapter.*

RCW 9.94A.533 (emphasis added).

Craig Burton acknowledges that the firearm enhancement statute is mandatory, must be served in total confinement, and must run consecutively with all other sentences. He argues, however, that the statute never proscribed modification of a firearm enhancement as an exceptional sentence under RCW 9.94A.535. To support this argument, he emphasizes language regarding mandatory minimum sentences, RCW 9.94A.540(1), which specifically notes the "minimum terms of total confinement are mandatory and shall not be varied or modified under RCW 9.94A.535." Burton observes that RCW 9.94A.533, the firearm enhancement statute, lacks the language "and shall not be varied or modified under RCW 9.94A.535." Because of this omission in the latter statute, Burton contends that the firearm enhancement language demonstrates the legislature's intent to allow reduction in confinement through exceptional sentences for firearm enhancements.

34

To rebuff Craig Burton's analytical line, the State relies on *State v. Brown*, 139 Wn.2d 20, 983 P.2d 608 (1999), *overruled on other grounds by State v. Houston-Sconiers*, 188 Wn.2d 1, 391 P.3d 409 (2017). In *State v. Brown*, a jury convicted Natalie Brown of second degree assault with a deadly weapon because she sliced a man's nose with a knife. The standard range sentence on her assault conviction was three to nine months, but she was also subject to a twelve-month deadly weapon enhancement under RCW 9.94A.310(4)(b), now RCW 9.94A.533(4). The sentencing court imposed an exceptional, mitigated sentence of seven months and the State appealed. Although *Brown* involved a deadly weapon enhancement instead of a firearm enhancement, Brown and the State raised the same arguments. *State v. Brown*, 139 Wn.2d at 26-28.

In rejecting Brown's argument, our Supreme Court reasoned:

> RCW 9.94A.310(4) begins by providing that deadly weapon enhancements "shall be added to the presumptive sentence[.]" The more specific language within RCW 9.94A.310(4)(e) requires that "[n]otwithstanding any other provision of law, any and all deadly weapon enhancements under this section are mandatory, [and] shall be served in total confinement." This language clearly dictates a reading by the average informed lay voter that deadly weapon enhancements are mandatory and must be served.
>
> . . . .
> [J]udicial discretion to impose an exceptional sentence does not extend to a deadly weapon enhancement in light of the absolute language of RCW 9.94A.310(4)(e).

*State v. Brown*, 139 Wn.2d at 28-29 (some alterations in original). The language of the deadly weapon enhancement statute, RCW 9.94A.533(4), nearly repeats the language of

35

the firearm enhancement statute, RCW 9.94A.533(3).

Our Supreme Court recently overruled the holding of *Brown* as it applies to juveniles. *State v. Houston-Sconiers*, 188 Wn.2d 1 (2017). This recent decision, however, does not undermine the applicability of *Brown* for an adult. The *Houston-Sconiers* court based its rejection of *Brown* entirely on the Eighth Amendment prohibitions against cruel punishment. Craig Burton was twenty-five years old at the time of his offenses, thus the juvenile rule does not apply to him. The court's holding in *Brown* controls this appeal.

*Issue No. 6: Whether the trial court erred by ruling it lacked authority to grant an exceptional sentence downward on the base sentencing range?*

*Answer 6: Yes.*

We now address the trial court's refusal to grant a downward sentence for that portion of the sentence attributed to the second degree assault convictions. Craig Burton contends the trial court erred during sentencing when it determined it had no authority or discretion to grant an exceptional, mitigated sentence based on RCW 9.94A.535(1). The State responds, as it did at sentencing, that the court lacked a basis for a downward departure because the factors Burton relies on were inherent in the standard range sentence. We agree with Burton and hold that the trial court erred in deciding it had no discretion to impose an exceptional, mitigated sentence since RCW 9.94A.535(1) provides a ground for a downward departure based on factors distinct from those

36

implanted in the standard range.

We juxtapose subsections of two important statutes within the Sentencing Reform Act of 1981, chapter 9.94A RCW. First, RCW 9.94A.585 declares, in part:

> (1) A sentence within the standard sentence range, under RCW 9.94A.510 or 9.94A.517, for an offense shall not be appealed.

Second, RCW 9.94A.535 reads, in relevant part:

> The court may impose a sentence outside the standard sentence range for an offense if it finds, considering the purpose of this chapter, that there are substantial and compelling reasons justifying an exceptional sentence. . . .
>
> (1) Mitigating Circumstances—Court to Consider
> The court may impose an exceptional sentence below the standard range if it finds that mitigating circumstances are established by a preponderance of the evidence. The following are illustrative only and are not intended to be exclusive reasons for exceptional sentences.
>
> . . . .
>
> (e) *The defendant's capacity to appreciate the wrongfulness of his or her conduct, or to conform his or her conduct to the requirements of the law, was significantly impaired. Voluntary use of drugs or alcohol is excluded.*

(Emphasis added.)

The trial court sentenced Craig Burton within the standard sentence range for each assault. Therefore, within the confines of these two statutes, we pose the following interrelated questions. First, does the former statute disqualify Burton from appealing his sentence? Second, if not, was the trial court precluded from ordering an exceptional sentence because the factor, on which Burton sought a downward sentence, inhered in the standard range sentence?

37

Despite the uncompromising language of RCW 9.94A.585, a defendant may appeal the procedure the trial court followed when imposing a standard range sentence. *State v. Knight*, 176 Wn. App. 936, 957, 309 P.3d 776 (2013). While no defendant is entitled to an exceptional sentence below the standard range, every defendant is entitled to ask the trial court to consider such a sentence and to have the alternative actually considered. *State v. Grayson*, 154 Wn.2d 333, 342, 111 P.3d 1183 (2005). Failure to consider an exceptional sentence is reversible error. *State v. Grayson*, 154 Wn.2d at 342. When a defendant requested an exceptional sentence, this court may review whether the trial court refused to exercise discretion at all or relied on an impermissible basis for refusing to impose an exceptional sentence below the standard range. *State v. Garcia-Martinez*, 88 Wn. App. 322, 330, 944 P.2d 1104 (1997). Also, when the sentencing court acts outside the structure set by the Sentencing Reform Act the appellate court may review any such departure. *State v. Parker*, 132 Wn.2d 182, 188, 937 P.2d 575 (1997).

The State correctly argues that the trial court's reasons must be substantial and compelling and may not reflect factors already considered in computing the presumptive range for the offense. *State v. Pascal*, 108 Wn.2d 125, 135-36, 736 P.2d 1065 (1987). Nevertheless, Burton requested a mitigated sentence based on one of the enumerated circumstances that justify an exceptional sentence, not an unlisted substantial and compelling reason. The trial court committed error in believing Burton failed to raise one of the enumerated mitigating circumstances as justification for a downward departure.

38

Craig Burton's trial court unconditionally refused to exercise its discretion when sentencing Burton within the standard range.

We must now address two questions that arise under the language of RCW 9.94A.535. First, did Craig Burton present evidence of significant impairment of his capacity to appreciate the wrongfulness of conduct or to conform to the requirements of the law when, as we previously ruled, he presented no evidence of an inability to form the intent to cause fear and apprehension of immediate bodily injury in others? Second, did Craig Burton "voluntarily use" drugs or alcohol such as to disqualify him from the reduced sentence?

To qualify for a downward departure under RCW 9.94A.535(1)(e), the record must establish not only the existence of the mental condition, but also a connection between the condition and significant impairment of the defendant's ability to appreciate the wrongfulness of his conduct or to conform his conduct to the requirement of the law. *State v. Schloredt*, 97 Wn. App. 789, 802, 987 P.2d 647 (1999). In *Schloredt*, the trial court properly denied the request because, although the defendant suffered from a depressive disorder, the defendant's mental disorder did not compromise his ability to control his actions on the dates of the offenses.

In answer to our first question, we note that RCW 9.94A.535(1)(f) requires the defendant to show by a preponderance of evidence that his mental condition prevented him from appreciating the wrongfulness of his conduct. The statute does not require that

39

the defendant show that his mental capacity precluded him from committing the charged crime or from forming the intent to commit a specific intent crime.

We previously held that Craig Burton failed to present evidence that he could not form the intent to cause fear and apprehension in the minds of the law enforcement officers. Nevertheless, our review of the record shows Burton provided some evidence that he did not, because of mental impairment, grasp the wrongfulness of his conduct. Testimony showed Burton suffered from ADHD, the impetus of Burton's crime was suicide by police, and Burton suffered suicidal ideations as a result of his Paxil medication. Alternatively, Burton presented evidence that he could not conform his conduct to the requirements of the law. Although the trial court may still deny Burton's request for a downward departure from the standard range, sufficient evidence allows the trial court to consider a mitigated sentence.

We must still inquire whether Craig Burton's use of Paxil and imbibing of alcohol disqualifies him from a downward sentence when RCW 9.94A.535 disallows mitigation when the crime results from voluntary use of drugs or alcohol. Craig Burton alleges Paxil, a prescription drug, debilitated him. We find no decision that addresses whether use of a prescription drug constitutes "voluntary use" such as to debar one from an exceptional sentence.

Society does not consider the use of prescription drugs morally wrong. Therefore, we assume that the legislature, when excluding mental incapacity resulting from

40

voluntary use of drugs, referred to drug abuse or unlawful consumption of controlled substances. Use of a prescription drug is involuntary in the sense that the patient did not choose to take the drug for recreational purposes, but rather a licensed physician directed the patient to ingest the drug because of an involuntary physical or mental condition.

To the extent that the trial court finds that Craig Burton committed his crimes as a result of the use of Paxil and the Paxil interfered in Burton's ability to comprehend the wrongfulness of his conduct, the trial court may reduce Burton's sentence for second degree assaults. To the extent that the trial court finds that Craig Burton's use of Paxil led to his imbibing alcohol and the alcohol use contributed to Burton's inability to appreciate the error in his conduct, the trial court may lower Burton's sentence for assault. To the extent the trial court finds that Craig Burton's imbibing of alcohol by itself was voluntary and the influence of alcohol was the only factor reducing Burton's mental capacity, the trial court may not diminish Burton's sentence.

*Issue 7: Was sentencing Craig Burton to ten years and three months of imprisonment cruel and unusual because he lacked a criminal history and he discharged a firearm during a mental breakdown and without physically harming another?*

*Answer 7: No.*

The trial court sentenced Craig Burton for 123 months' confinement for three counts of second degree assault with three firearm weapons enhancements. Burton contends his sentence constitutes cruel and unusual punishment as prohibited by the

41

federal and Washington State Constitutions. He alleges his sentence is unconstitutionally

excessive because no legitimate penological interest justifies its length. The State

responds that Burton's sentence is constitutional because it is within the statutory

maximum and is not grossly disproportionate to the crimes he committed. We agree with

the State.

The Eighth Amendment to the United States Constitution proscribes infliction of

"cruel and unusual punishment," while Washington Constitution article I, section 14

proscribes infliction of "cruel punishment." *State v. Manussier*, 129 Wn.2d 652, 674,

921 P.2d 473 (1996). The state constitutional proscription against cruel punishment

provides greater protection than the Eighth Amendment. *State v. Manussier*, 129 Wn.2d

at 674. Therefore, we limit our analysis to decisions under the state constitution.

A sentence is unconstitutionally cruel when it is grossly disproportionate to the

crime for which it is imposed. *State v. Whitfield*, 132 Wn. App. 878, 901, 134 P.3d 1203

(2006). A punishment is grossly disproportionate only if the conduct should never be

proscribed or if the punishment is clearly arbitrary and shocking to the sense of justice.

*State v. Smith*, 93 Wn.2d 329, 344-45, 610 P.2d 869 (1980). To determine whether a

sentence is grossly disproportionate to the crime, an appellate court considers four

factors, known as the *Fain* factors: (1) the nature of the offense, (2) the legislative

purpose behind the criminal statute, (3) the punishment defendant would have received in

other jurisdictions for the same offense, and (4) the punishment meted out for other

offenses in the same jurisdiction. *State v. Witherspoon*, 180 Wn.2d 875, 887, 329 P.3d 888 (2014); *State v. Fain*, 94 Wn.2d 387, 397, 617 P.2d 720 (1980).

In addition to the *Fain* factors, Craig Burton argues the court should consider the penological justifications for sentencing when determining if a sentence is excessive, namely retribution, deterrence, incapacitation, and rehabilitation. The only case Burton cites to support this additional set of considerations is *Graham v. Florida*, 560 U.S. 48, 130 S. Ct. 2011, 176 L. Ed. 2d 825 (2010). No Washington decisions expressly review these factors, and we decline to adopt the factors without direction from our state high court. We surmise that the *Fain* factors indirectly subsume the *Graham* factors.

*Nature of the Offense.* We now address the *Fain* factors. Craig Burton argues the first factor weighs in his favor because the nature of second degree assault in the abstract may sound serious, but the specific facts in his prosecution prove otherwise. Although Burton discharged eleven shots while officers stood nearby, he fired in a harmless direction and without any intention of hurting anyone. He argues this conduct echoes the misdemeanor unlawful discharge of a firearm, excluding the finding that Burton intended to cause the officers fear of bodily injury. Unfortunately for Burton, we cannot ignore his intent to cause imminent fear of death and the consequential culpability. Burton created a tense environment with multiple police who felt ambushed by an armed man from the cover of dark.

43

*Legislative Purpose.* Craig Burton argues that severely punishing him does not serve the firearm enhancement legislative purpose to stigmatize the use of deadly weapons by criminals. The firearm enhancement arises from a larger statute passed as the "Hard Time for Armed Crime" initiative in recognition that criminals carrying firearms pose a more serious threat than other criminals. *State v. Berrier*, 110 Wn. App. at 649-50 (2002). The initiative sought to punish armed offenders more harshly to discourage the use of firearms. *State v. Berrier*, 110 Wn. App. at 649-50. Burton acknowledges the concern about the use of guns as being legitimate, but claims those concerns fail to justify his ten-year sentence. We disagree. Burton's sentence fulfills the legislative purposes because of his use of a gun. Also, the deterrent effect of his sentence could discourage others from using a firearm while engaging in reckless criminal activity. Despite Burton aiming into trees where he believed no one to be present, a bullet could have injured or killed an unknown person nearby. We find this factor weighs against Burton.

*Other Jurisdictions.* Measuring the punishment a defendant would have received in other jurisdictions for the same offense allows this court to discern the normality of Washington's punishment. We briefly review the respective recommended sentences if Burton committed the same conduct in the northwestern states of Alaska, Idaho, and Oregon.

In Alaska, a person commits assault in the third degree when one recklessly places

44

another person in fear of imminent serious physical injury by means of a dangerous instrument. AS 11.41.220(a)(1)(A). Third degree assault represents a class C felony with a maximum term of five years and a presumptive sentencing range of zero to 18 months. AS 12.55.125(e)(1). Use of a dangerous instrument in furtherance of an offense may increase one's sentence in Alaska. Nevertheless, under Alaskan law, the court could not aggravate Craig Burton's sentence because the aggravating factor is a necessary element of the crime of third degree assault. AS 12.55.155(e); *Ned v. State*, 119 P.3d 438, 445 (Alaska Ct. App. 2005).

In Idaho, assault is "[a]n intentional, unlawful threat by word or act to do violence to the person of another, coupled with an apparent ability to do so, and doing some act which creates a well-founded fear in such other person that such violence is imminent." IC 18-901. Aggravated assault includes assault with a deadly weapon or instrument without intent to kill. IC 18-905(a). An aggravated assault carries a maximum term of imprisonment of five years. IC 18-906. Aggravated assault against a police officer doubles the punishment to ten years. IC 18-915; *State v. Alsanea*, 138 Idaho 733, 745, 69 P.3d 153 (Ct. App. 2003). Under IC 19-2520, an offender is subject to an extended sentence by committing aggravated assault with a firearm. The extended sentence increases the maximum sentence authorized for a crime by fifteen years. IC 19-2520; *State v. Farwell*, 144 Idaho 732, 736, 170 P.3d 397 (2007). Thus, Craig Burton would have faced a maximum sentence of twenty-five years in Idaho.

45

In Oregon, second degree assault, a class B felony, requires actual physical injury to another. ORS 163.175. In fact, all forms of assault in Oregon require actual infliction of physical injury. ORS 163.160-185. In contrast, the Oregon crime of "menacing" occurs when, "if by word or conduct the person, [the accused] intentionally attempts to place another person in fear of imminent serious physical injury." ORS 163.190(1). Menacing constitutes a class A misdemeanor. ORS 163.190(2). Oregon requires a sentencing court to impose a five-year minimum term of imprisonment if the defendant used or threatened to use the firearm during the commission of a felony. ORS 161.610; *State v. Stelljes*, 84 Or. App. 637, 639-40, 735 P.2d 24 (1987). This statute would not apply to Craig Burton because he would only be convicted of a misdemeanor under Oregon law. The statutory maximum for a class A misdemeanor in Oregon is one year. ORS 161.615.

The third *Fain* factor neither benefits nor harms Craig Burton's claim of cruel punishment since sentences in other jurisdictions range from as low as thirty days to as high as twenty-five years. The comparisons also fall short because of the possible effects of charging decisions.

*Other Washington Offenses.* In the final *Fain* factor, Craig Burton contends he will suffer more punishment than others who committed more serious or harmful offenses. He highlights first degree assault or first degree rape when a person may only serve five years of incarceration.

46

We encounter difficulty in assessing this last factor. Even our Supreme Court has struggled with this factor:

> There is no logical or practical basis for comparison of punishment appellant might receive for other crimes committed in Washington. Sentences under the Sentencing Reform Act vary with each defendant's criminal history and the presence or absence of aggravating or mitigating factors.

*State v. Manussier*, 129 Wn.2d at 678 (1996). Considering our analysis with regard to a comparison with drive-by shooting, we conclude that this factor does not assist Craig Burton. Burton's high sentence results not from the second degree assault convictions, but from the firearm enhancements. If someone committed rape or first degree assault with the use of a firearm, the person's sentence would also significantly increase.

## CONCLUSION

We affirm Craig Burton's convictions for second degree assault. We remand to the trial court for resentencing. On resentencing, the trial court should determine whether to grant Burton an exceptional downward sentence for the sentencing resulting from the second degree assault convictions. Otherwise, we also affirm the trial court's sentence. We deny the State costs on appeal.

No. 34230-1-III
*State v. Burton*

A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to RCW

2.06.040.

_____ Fearing, J.

Fearing, C.J.

WE CONCUR:

_____
Lawrence-Berrey, J.

_____
Pennell, J.