[No. 52188–3.   En Banc.   May 7, 1987.]

THE STATE OF WASHINGTON, *Appellant*, v.
MARY L. PASCAL, *Respondent*.

126

*Donald C. Brockett, Prosecuting Attorney*, and *Fred J. Caruso, Chief Deputy*, for appellant.

*Richard L. Cease, Public Defender*, and *Carl E. Hueber, Assistant*, for respondent.

CALLOW, J.—This case involves an appeal of a sentence below the presumptive range set forth in the Sentencing Reform Act of 1981 (RCW 9.94A). The defendant had stabbed her boyfriend and was convicted of first degree manslaughter. The presumptive sentence range was 31 to 41 months. The trial court sentenced the defendant to 90 days, consisting of 30 days of total confinement, 30 days of partial confinement, and 240 hours of community service. The court also sentenced her to an additional year of community supervision. The State asks that we review this sentence. We affirm.

Mary Louise Pascal, aged 20, the defendant, and Richard A. Kieffer, aged 21, lived together and were the parents of an 18–month–old child. During 1984 there were several incidents where Kieffer had beaten and verbally abused Pascal. On May 26, 1984 he had slapped and choked her. In August he had thrown her on the floor and beaten her. Later that month he had hit her in the head. In December he had pressed her knees to her throat and subjected her to extensive and bitter verbal abuse. On December 24, 1984 he again beat her and when this encounter continued, she stabbed him to death.

The testimony was that on the day of his death, Kieffer

had shoved the defendant, hit her, slapped her, and knocked her down. The statement given by the defendant following the stabbing describes the confusion of the scene as follows:

Q. That just left you and Richard?

A. And Michelle at home, and that was about, about 9 o'clock and he got all mad at me, saying, calling me a Scrooge and a bitch and everything cause he was mad because he wanted to go out and get drunk and plus me 'n him really weren't gettin' along or anything because, ah, we just weren't getting along but we still love each other and everything, and we love our daughter very much and he got mad at me and we started arguing saying we were going to break up 'n everything and then, and then, it happened. My mom and them were still outside and the door must have been open a little bit and he got really mad at me and he, and he hit me and he knocked me down and I got up and . . .

Q. Where did he hit you at?

A. He pushed me down. He kind of shoved me and I . . .

Q. He didn't hit you, he just shoved you down?

A. Yeah.

Q. Okay.

A. And I fell on the floor and I got up and I pushed him back and I told him to knock it off and he told me that I really pissed him off and then he, he slapped me, slapped me hard in the eye with, I was standing in the kitchen cryin' and he went back and sat back on the couch and he was playin' with Michelle 'n everythin' and I don't know, I just got really upset because this, he wanted to break up and I don't know he . . .

Q. You got upset because you felt that Richard wanted to break up with you . . .

A. Yeah and . . .

Q. What did you do then?

A. Um, um, he's my whole world, he and my little girl and I don't know what I would do (crying, inaudible) if I didn't have them both, they mean so much to me that I need to have both of them. I wouldn't have no reason to live and so I grabbed a knife and I went and told him that.

Q. Where, where did you get the knife from?

A. From the kitchen in the, in the drawer, and I handed it to him and I told him that he might as well kill me because I told him that he and Michelle meant so much to me that if I couldn't have both of them that, that I don't have no reason to live . . . and we started arguing again and he was tellin' me that I was a bitch and everything and I told him that he was a bastard and we were cussing at each other and then things quieted down and then he told me he was going to take Michelle and I told him that he wasn't going to take her away from me and I don't know, he wasn't acting like himself . . . he still had the knife with him and he told me he was going to take Michelle and I told him he was going to have to kill me if he was going to take her away from me and then I went and grabbed her and I sat her down on my lap and then he come walking over to me and he just looked different and he told me, he kept telling me "I'm going to take her, I got to take her" . . . and then I was sittin' down and he walked up to me and he had the knife, in his left hand I think, and he took his right hand and he kind of tilted my head back, and I was gonna see what he was goin' to do but he brought the knife close to me but not enough to where he could get me with it or anything and then I put Michelle down and I stood up and he gave me the knife and then I went and sat across from the room and he was sittin' there and he was . . .

Q. He gave you the knife?

A. Yeah . . . he gave it to me.

Q. Did he say something to you when he gave you the knife?

A. I just asked him, I go "Richard would you please give me the knife?" so he gave the knife and he went and sat down and then he went and, and I sat across the room and he told me "Go put the knife away" and I told him that I wasn't born yesterday, because I thought if I did that he would try taking Michelle and I thought if I kept the knife with me I could scare him into thinking I would, that I would get him with it and then finally he said that he was gonna just leave and he was never going to look back and he said he said he was just going to kiss Michelle and leave and

he went and kissed her and I walked up to him and I told him that he wasn't walkin' out on us and he told me that he was and we kind of pushed each other and I told him, I told him that he hurt me for the last time and that I was going to try to scare him and I brought the knife up and he told me "go ahead" and I thought I could get him and you know, kind of go like that and miss him which I thought I did, but then, after I tried scaring him and did it, he told me, he told me "Babe, you got me" and then I look [sic] at his shirt and I seen a whole bunch of blood gushing out and I got scared and I threw the knife down and I grabbed him and I tried sittin' him down in the chair and it fell over and he kind of fell on the ground . . .

The autopsy revealed the victim's blood alcohol to be .20 percent.

The defendant was charged with second degree murder and manslaughter. She contended that she acted in self–defense and suffered from battered woman syndrome. The jury found that the defendant lacked the requisite intent to murder Kieffer, but did not act in self–defense. She was convicted of first degree manslaughter. She had no prior criminal history. Under the Sentencing Reform Act of 1981, first degree manslaughter for a person with no criminal history carries a presumptive sentencing range of 31 to 41 months. The trial court sentenced Pascal to 90 days, consisting of 30 days of total confinement, 30 days of partial confinement and 240 hours of community service. The court also sentenced her to an additional year of community supervision. The court cited the following reasons for imposing the sentence:

The following mitigating circumstances existed in this case:

(a) The victim in this case was an initiator, willing participant, aggressor or provoker of the incident.

(b) The defendant committed the crime under duress, coercion, threat or compulsion insufficient to constitute a complete defense but which significantly affected her conduct.

(c) The defendant's capacity to appreciate the wrongfulness of her conduct or to conform her conduct to the

requirements of the law was significantly impaired because she is a battered woman.

The following purposes of the Sentencing Reform Act justify an exceptional sentence:

(a) An exceptional sentence is justified to insure [that] punishment is proportionate to the offender's criminal history, which in this case is zero.

(b) Protection of the public must be considered, and Mary Louise Pascal does not pose a threat to the public.

(c) An offender is to be offered an opportunity to improve herself, and Mary Louise Pascal has demonstrated her ability and willingness to improve herself vocationally and educationally.

(d) Frugal use of the State's resources must be considered and the imposition of institutional confinement would be contrary to this purpose.

We accepted certification of this case from the Court of Appeals for resolution of the following issues: (1) whether the State has the statutory right to appeal a sentence below the presumptive range set forth in the sentencing reform act; (2) whether the possible imposition of a longer sentence would constitute double jeopardy and hence render an appeal by the State unconstitutional; and (3) whether the trial court's sentence must be reversed either because there were inadequate reasons to impose an exceptional sentence, or because the sentence imposed was "clearly too lenient".

I

The State originally appealed the defendant's sentence to the Court of Appeals. The defendant contends that the State had no statutory right to appeal this sentence, having instead only the right to seek discretionary review under RAP 2.3. We disagree.

The issue presented is a jurisdictional question. Article 4, section 30(2) (amendment 50) of the Washington State Constitution states that:

The jurisdiction of the court of appeals shall be as provided by statute or by rules authorized by statute.

The Legislature, in enacting the sentencing reform act, expressly provided the Court of Appeals with jurisdiction to

hear the State's appeal in the present case.

A sentence outside the sentence range for the offense is subject to appeal by the defendant or the state. The appeal shall be to the court of appeals in accordance with rules adopted by the supreme court.

RCW 9.94A.210(2).

█ Despite the plain language of the above statute, the defendant argues that the Rules of Appellate Procedure bar the State's appeal. *See* RAP 1.1(h), 2.2(b). However, these rules govern the "administration and procedures" of the Court of Appeals, *see* RCW 2.06.030, and the rules supersede only those statutes pertaining to court *procedures*. RAP 1.1(g). There is no statute which grants to any forum the authority to confine the *jurisdiction* of the Court of Appeals through rulemaking power. *Maple Leaf Investors, Inc. v. Department of Ecology*, 10 Wn. App. 586, 588, 521 P.2d 742 (1974). Thus, while we have enacted rules describing the manner in which exceptional sentences may be appealed, *see* RAP 18.15, it is for the Legislature to determine whether such appeals shall be heard at all. The Legislature has responded in the affirmative by enacting RCW 9.94A.210(2).

## II

Next, the defendant asserts that the double jeopardy clauses of the state and federal constitutions prohibit the State from seeking imposition of a longer sentence on appeal.[1] She contends that because she has fully served the sentence imposed by the trial court, the State may not attempt to resentence her even if the original sentence was erroneous and invalid. We conclude that the possible imposition of a longer sentence does not violate double jeopardy, and does not defeat the State's right to appeal.

In *United States v. DiFrancesco*, 449 U.S. 117, 129, 66 L.

---

[1]Although the defendant relies on the double jeopardy clauses of both article 1, section 9 of the Washington Constitution and the fifth amendment to the United States Constitution, our state provision is interpreted in the same manner as the federal provision. *State v. Ridgley*, 70 Wn.2d 555, 556, 424 P.2d 632 (1967).

Ed. 2d 328, 101 S. Ct. 426 (1980), the Supreme Court stated:

> [The guaranty against double jeopardy] has been said to consist of three separate constitutional protections. It protects against a second prosecution for the same offense after acquittal. It protects against a second prosecution for the same offense after conviction. And it protects against multiple punishments for the same offense.

Foremost among these protections is that afforded to acquittals. Because of the strong public interest in the finality of criminal judgments, a verdict of not guilty absolutely shields the defendant from retrial. *Tibbs v. Florida,* 457 U.S. 31, 41, 72 L. Ed. 2d 652, 102 S. Ct. 2211 (1982); *DiFrancesco,* at 129–30. Similarly, a defendant whose conviction is reversed on appeal due to insufficiency of the evidence may not be retried for the same offense. *Burks v. United States,* 437 U.S. 1, 18, 57 L. Ed. 2d 1, 98 S. Ct. 2141 (1978). The Court had expounded upon the principles underlying this prohibition against multiple trials:

> The underlying idea, one that is deeply ingrained in at least the Anglo–American system of jurisprudence, is that the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty.

*Green v. United States,* 355 U.S. 184, 187–88, 2 L. Ed. 2d 199, 78 S. Ct. 221, 6 A.L.R.2d 1119 (1957).

Here, however, the defendant's claim rests not on the prohibition against multiple trials; rather, it involves the double jeopardy ban against multiple punishment and its application to sentencing proceedings. In this area the Court has taken a more restrained approach, emphasizing that "a sentence does not have the qualities of constitutional finality that attend an acquittal". *DiFrancesco,* at 134. In particular, the Court has ruled that a defendant

may have his or her sentence increased if the original sentence was erroneous, and hence, invalid. *DiFrancesco; Bozza v. United States,* 330 U.S. 160, 91 L. Ed. 818, 67 S. Ct. 645 (1947). The State may seek to impose the increased sentence by appeal. *DiFrancesco.*

*DiFrancesco* involved a sentencing scheme similar to that created by the sentencing reform act. There, the defendant, who had previously received a 9–year sentence on various charges, was subsequently sentenced to two concurrent 10–year terms (to be served concurrently with the 9–year term) following his conviction on racketeering counts. Thus, he received an additional punishment of only 1 year for his racketeering convictions. He had been sentenced pursuant to the dangerous special offender statute, 18 U.S.C. §§ 3575–3576. This statute permitted either the defendant or the government to seek review of a sentence to determine "whether the procedure employed was lawful, the findings made were clearly erroneous, or the sentencing court's discretion was abused." The Court rejected the defendant's contention that this provision for a governmental appeal and a subsequent increase in sentence constituted multiple punishment. The Court emphasized that "[t]his limited appeal does not involve a retrial or approximate the ordeal of a trial on the basic issue of guilt or innocence." *DiFrancesco,* at 136. (*Cf. Bullington v. Missouri,* 451 U.S. 430, 68 L. Ed. 2d 270, 101 S. Ct. 1852 (1981); *State v. Hennings,* 100 Wn.2d 379, 670 P.2d 256 (1983) (double jeopardy clause prohibits later resentencing to a longer term where the sentencing procedures contain the hallmarks of the trial on guilt or innocence)). Nor, in light of the statute providing for an appeal, could the defendant contend that he had a reasonable expectation of finality in the original sentence. *DiFrancesco,* at 139. *Accord, Bozza* (where statute required sentence of fine and imprisonment and trial court originally imposed only sentence of imprisonment, double jeopardy did not forbid later increase in sentence).

Washington cases have adhered to these principles. In *State v. Pringle,* 83 Wn.2d 188, 517 P.2d 192 (1973), the

trial court erroneously computed the defendant's minimum sentence for a robbery conviction when it failed to enter a statutorily required finding that the defendant had been armed with a deadly weapon. We held that the sentence could be increased on remand without violating the double jeopardy clause, noting:

> When a sentence has been imposed for which there is no authority in law, the trial court has the power and duty to correct the *erroneous* sentence, when the error is discovered. This does not, of course, affect the finality of a correct judgment and sentence that was valid at the time it was pronounced.

*Pringle,* at 193. *Accord, State v. Smissaert,* 103 Wn.2d 636, 694 P.2d 654 (1985); *State v. Luke,* 42 Wn.2d 260, 254 P.2d 718, *cert. denied,* 345 U.S. 1000 (1953). *Cf. State ex rel. Sharf v. Municipal Court,* 56 Wn.2d 589, 354 P.2d 692 (1960) (sentence originally imposed may not be later increased where there is no showing that the original sentence was erroneous).

*DiFrancesco* and *Pringle* both emphasize that an invalid sentence may be increased, even after the defendant has commenced serving the sentence, without violating the double jeopardy clause. *DiFrancesco,* at 138–39; *Pringle,* at 193–94. Defendant Pascal urges that this principle is inapplicable where an invalid sentence has been fully served. However, she cites no authority which supports this proposition, nor have we located any such authority. *Ex parte Lange,* 85 U.S. (18 Wall.) 163, 21 L. Ed. 872 (1873), upon which she relies in part, is distinguishable. In *Lange,* the defendant was convicted of a crime punishable by fine *or* imprisonment. The trial court sentenced him to a fine *and* 1 year's imprisonment. After he had paid the fine and had served 5 days in prison, the court realized its error and sought to resentence the defendant to a new 1–year prison term. The Supreme Court held that this constituted double jeopardy because at the time the second sentence was rendered, "the prisoner had fully performed, completed, and endured *one of the alternative punishments which the law*

*prescribed for that offense".* (Italics ours.) *Lange,* at 176. Thus the case turned on the fact that the defendant had suffered a valid punishment. An appeal of an allegedly erroneous sentence under the sentencing reform act presents a different situation altogether, and is not governed by *Lange. See also DiFrancesco,* at 138–39. (The Court held that the *Lange* rule is to be confined to the specific facts of that case.)

We hold, therefore, that permitting the State to appeal a sentence below the presumptive range set forth in the sentencing reform act, claiming that the initial pronouncement of sentence was erroneous and for the purpose of seeking a longer sentence, does not violate the double jeopardy clause of the state or federal constitutions.

### III

We now reach the merits of the State's appeal. RCW 9.94A.210(4) of the sentencing reform act provides:

> To reverse a sentence which is outside the sentence range, the reviewing court must find: (a) Either that the reasons supplied by the sentencing judge are not supported by the record which was before the judge or that those reasons do not justify a sentence outside the standard range for that offense; or (b) that the sentence imposed was . . . clearly too lenient.

The State contends that reversal of the defendant's sentence is required by both subsections (a) and (b) of the above provision.

RCW 9.94A.210(4)(a) involves a 2–part analysis. First, the appellate court must determine if the record supports the trial court's reasons for imposing an exceptional sentence. As this is a factual inquiry, the trial court's reasons will be upheld unless they are clearly erroneous. *State v. Nordby,* 106 Wn.2d 514, 517–18, 723 P.2d 1117 (1986). The appellate court next must independently determine, as a matter of law, whether the reasons given justify the imposition of an exceptional sentence. *Nordby,* at 518. The trial court's reasons must be "substantial and compelling", and may not take into account factors already considered in

computing the presumptive range for the offense. RCW 9.94A.120(2); *Nordby,* at 518.

The trial court relied largely on the following mitigating factors in determining the defendant's sentence.

>  (a) The victim in this case was an initiator, willing participant, aggressor or provoker of the incident.

>  (b) The defendant committed the crime under duress, coercion, threat or compulsion insufficient to constitute a complete defense but which significantly affected her conduct.

>  (c) The defendant's capacity to appreciate the wrongfulness of her conduct or to conform her conduct to the requirements of the law was significantly impaired because she is a battered woman.

These findings are supported by the record; there was evidence that on several occasions, both prior to and on the day of the incident in which Richard Kieffer was killed, Kieffer had subjected the defendant to physical beatings and to verbal and emotional abuse. Furthermore, the trial court was justified in relying on these factors in imposing an exceptional sentence. The sentencing reform act specifically identifies these as valid mitigating circumstances. *See* RCW 9.94A.390(1)(a), (c), (e). As explained in D. Boerner, *Sentencing in Washington* § 9.12(c) (1985),

>  The Guidelines contain a number of mitigating factors applicable in situations where circumstances exist which tend to establish defenses to criminal liability but fail. In all these situations, if the defense were established, the conduct would be justified or excused, and thus would not constitute a crime at all. The inclusion of these factors as mitigating factors recognizes that there will be situations in which a particular legal defense is not fully established, but where the circumstances that led to the crime, even though falling short of establishing a legal defense, justify distinguishing the conduct from that involved where those circumstances were not present. Allowing variations from the presumptive sentence range where factors exist which distinguish the blameworthiness of a particular defendant's conduct from that normally present in that crime is wholly consistent with the underlying principle.

Here, the defendant at trial claimed that she killed Kieffer in self–defense and that she suffered from battered woman syndrome. Although this defense failed and she was convicted of manslaughter, the trial judge in performing his sentencing function could evaluate the evidence of these mitigating factors and find that her actions significantly distinguished her conduct from that normally present in manslaughter. The trial court properly considered these factors.

The trial court made these additional findings:

(a) An exceptional sentence is justified to insure [that] punishment is proportionate to the offender's criminal history, which in this case is zero.

(b) Protection of the public must be considered, and Mary Louise Pascal does not pose a threat to the public.

(c) An offender is to be offered an opportunity to improve herself, and Mary Louise Pascal has demonstrated her ability and willingness to improve herself vocationally and educationally.

(d) Frugal use of the State's resources must be considered and the imposition of institutional confinement would be contrary to this purpose.

We note that these considerations, standing alone, would not justify an exceptional sentence. The first reason listed, the defendant's criminal history, is one of the components used to compute the presumptive range for an offense under the sentencing reform act. Therefore, criminal history may not be counted again as a mitigating circumstance to justify departure from the range. *Nordby,* at 518 & n.4. The next three reasons are also inadequate. The Legislature has stated that the sentencing reform act was designed to promote several significant interests, including protection of the public, the need for rehabilitation, and the need to make frugal use of state resources. *See* RCW 9.94A-.010(4), (5), (6). The presumptive sentence ranges established for each crime represent the legislative judgment as to how these interests shall best be accommodated. *See* D. Boerner, § 2.5(b), (c), (d). The trial court's subjective determination that these ranges are unwise, or that they do

not adequately advance the above goals, is not a substantial and compelling reason justifying a departure.

We conclude that while some of the reasons given by the trial court were inadequate grounds for an exceptional sentence, the factors relating to the particular circumstances of the defendant's crime are substantial and compelling reasons which do justify such a sentence.

The State finally contends that the defendant's sentence should be reversed pursuant to RCW 9.94A.210(4)(b), on the grounds that the sentence imposed was "clearly too lenient". At issue here is whether the duration of the defendant's sentence was justified. The standard range for first degree manslaughter with a criminal history of zero is 31 to 41 months. *See* RCW 9.94A.310, .320. The defendant here received a sentence totaling 90 days, plus an additional year of community supervision.[2]

The sentencing reform act does not explicitly define the term "clearly too lenient." A similar situation was posed in *State v. Oxborrow*, 106 Wn.2d 525, 723 P.2d 1123 (1986). There, we were asked to determine whether a particular sentence was "clearly excessive." That term also had not been defined in the act. We held that the abuse of discretion standard of review was applicable in determining whether a sentence was clearly excessive. *Oxborrow*, at 530. We now adopt that standard in reviewing a sentence which is alleged to be clearly too lenient.

Our observations in *Oxborrow* bear repeating here. As we noted, the purpose of the act is to "[develop] a system for the sentencing of felony offenders which structures, *but does not eliminate, discretionary decisions affecting sentences* . . ." RCW 9.94A.010. (Italics ours.) The act provides for structured decisions by requiring that there be "substantial and compelling reasons" for imposing any exceptional sentence, RCW 9.94A.120(2); the sufficiency of

---

[2]The trial court converted 30 days of the defendant's 90–day sentence to partial confinement, and 30 days to 240 hours of community service. The State did not challenge this aspect of the sentence.

the reasons given is subject to independent appellate review. *Nordby,* at 518. However, the Legislature also recognized that "not all exceptional fact patterns can be anticipated," Washington Sentencing Guidelines Comm'n, *Sentencing Guidelines Implementation Manual* § 9.94A-.390 comment (1984), and that the sentencing court must be permitted to tailor the sentence to the facts of each particular case. Employment of the abuse of discretion standard to determine whether the duration of an exceptional sentence is justified upholds the legislative intent to preserve discretionary decisions pertaining to sentencing. *See Oxborrow,* at 530–31.

Under the abuse of discretion standard, a sentence will be adjudged "clearly too lenient" only if the trial court's action was one that no reasonable person would have taken. *See State v. Armstrong,* 106 Wn.2d 547, 723 P.2d 1111 (1986) (applying this standard of review to sentences which are allegedly "clearly excessive"). Under the facts of this case, we cannot say that the trial court abused its discretion. The record shows that while the defendant did not persuade the jury that she acted in self–defense, she was nonetheless a battered, beaten, and abused woman. The trial court looked not only to the immediate circumstances of the fight in which Richard Kieffer was killed, but to the multitude of beatings which preceded it. The trial court believed this to be a case which cried out for sympathy, and sentenced the defendant accordingly. We find no abuse of discretion.

We hold that the State has a statutory right to appeal a sentence which is below the standard range established by the sentencing reform act, and that such an appeal does not violate the double jeopardy clause of the state or federal constitutions. We hold that the trial court provided sufficient reasons that justify the imposition of a sentence below the standard range, and that the trial court did not abuse its discretion in fixing the duration of the sentence.

The judgment of the trial court is affirmed.

DOLLIVER, ANDERSEN, and DURHAM, JJ., and CUNNING-
HAM, J. Pro Tem., concur.
PEARSON, C.J., concurs in the result.

UTTER, J. (concurring)—I concur in the views expressed
by Goodloe, J., which favor the halving rule. I do believe,
however, that it does not require slavish adherence to that
formula and that there is evidence in the record to support
the result of the trial court.

GOODLOE, J. (concurring in part, dissenting in part)—I
concur with the majority opinion as to the resolution of the
jurisdiction and double jeopardy issues. However, I disagree
with the majority's conclusion that the "abuse of discre-
tion" standard is the appropriate standard of review for
sentences outside the presumptive range under the Sen-
tencing Reform Act of 1981 (SRA). *See* RCW 9.94A.010 *et
seq.* Therefore, I dissent.

In *State v. Armstrong,* 106 Wn.2d 547, 552, 723 P.2d
1111 (1986) (Goodloe, J., dissenting), when called on to
interpret the SRA, I advocated a doubling rule to deter-
mine the extent a sentence could exceed the standard range
maximum. This doubling rule, which limits a sentence to
twice the presumptive maximum in all but the most severe
cases, helps ensure the central tenet of the SRA: that simi-
lar offenses receive similar punishment. RCW 9.94A.010(3).
The abuse of discretion standard does nothing to facilitate
this purpose, as is clearly reflected by this case.

The defendant, Mary Pascal, was found guilty of first
degree manslaughter. First degree manslaughter is defined
as recklessly causing the death of another person. RCW
9A.32.060. Reckless conduct involves knowingly disregard-
ing a substantial risk that a wrongful act may occur where
such disregard is a gross deviation from conduct that a rea-
sonable person would exercise in the same situation. RCW
9A.08.010. The presumptive sentencing range for the felony

of first degree manslaughter when the defendant does not have a criminal history is 31 to 41 months. RCW 9.94A.310. Pascal was sentenced to 90 days, far less than the presumptive minimum.

The Legislature has determined that for defendants with no criminal history the following crimes, among others, may warrant a sentence of or about 90 days: second degree perjury (RCW 9A.72.030); intimidating a public servant (RCW 9A.76.180); tampering with a witness (RCW 9A.72.120); third degree assault (RCW 9A.36.030); first degree malicious mischief (RCW 9A.48.070); first degree possession of stolen property (RCW 9A.56.150); theft of livestock (RCW 9A.56.080); and welfare fraud (RCW 74.08.331). To equate first degree manslaughter, through a like sentence, with crimes like second degree perjury, intimidating a public servant and welfare fraud renders ineffective the Legislature's attempt to effectuate proportionality in sentencing. The goal that similar crimes receive similar punishments is defeated when a defendant found guilty of first degree manslaughter is sentenced to 90 days.

The majority quotes from RCW 9.94A.010 stating that "the purpose of the act is to '[develop] a system for the sentencing of felony offenders which structures, *but does not eliminate, discretionary decisions affecting sentences* . . .'" Majority opinion, at 138. Unlike the majority, I do not believe the abuse of discretion standard of review for exceptional sentences provides any structure or guidance so that the trial court can exercise its discretion in a meaningful way. Once an exceptional sentence is determined to be appropriate, sentencing of the defendant is for all purposes left entirely in the hands of the trial judge. I further believe that meaningful appellate review will be severely limited by the abuse of discretion standard. When this standard was used prior to the SRA only one sentence in this state was successfully overturned on these grounds. *State v. Potts*, 1 Wn. App. 614, 464 P.2d 742 (1969). Therefore, additional guidance should be provided by this court to help courts achieve the purposes of the SRA.

I believe the rationale that I set forth in *State v. Armstrong, supra* (Goodloe, J., dissenting) is equally compelling when considering sentences which the State argues are clearly too lenient. Accordingly, when a lenient sentence is appropriate I advocate a "halving" rule: in all but the most extreme cases the trial judge would be required to impose a sentence of at least half of the presumptive minimum.[3] The halving rule is appropriate when mitigating circumstances exist which justify an exceptional sentence, but which do not call for a high disparity between the presumptive minimum and the actual sentence imposed. I believe this case to be such a case. While I have much compassion for Mary Pascal, and agree that justice and the mitigating circumstances do warrant an exceptional sentence, I do not believe that the facts justify a sentence of only 90 days for a first degree manslaughter conviction in light of the new legislative standards.

Unlike the abuse of discretion standard, the halving rule addresses the concerns expressed by the majority as it structures but does not eliminate the exercise of discretion by the trial judge. See majority opinion, at 139. For the reasons stated I would hold the trial court improperly imposed a 90-day sentence in this case. As the presumptive range was 31 to 41 months, I would remand for imposition of a sentence of no less than 15½ months.

DORE, J., concurs with GOODLOE, J.

---

[3]I concede that with short sentences the halving rule serves little purpose. Therefore, I do not advocate the halving rule when the presumptive minimum is under 12 months.