# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

# DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 58772-6-II |
| Appellant, | |
| v. | |
| LENEYAH NICOLE FROST, | UNPUBLISHED OPINION |
| Respondent. | |

VELJACIC, A.C.J. — Leneyah Nicole Frost pleaded guilty to one count of assault in the third degree and one count of theft in the third degree. Based on several factors, the trial court imposed an exceptional downward sentence. The State appeals, arguing the bases for all of the factors are impermissible. Because the factors are either unsupported by the record or do not justify a downward departure, we reverse and remand for resentencing.

FACTS

I. BACKGROUND

On February 27, 2023, around 2:25 a.m., Frost, 23, and two minor females, L.A. and N.A., entered a convenience store/gas station in Olympia. The clerk, and another patron, were in the store. The clerk observed Frost, N.A., and L.A. split up shortly after entering the store. N.A. grabbed a "bottle of Barefoot Pink Moscato wine worth approximately $6.99" and put it in her jacket. Clerk's Papers (CP) at 2. After seeing this, the clerk exclaimed, "you can either give me

the wine or go to jail." CP at 2. N.A. bolted for the door, struggling to get past the other patron, who unsuccessfully attempted to apprehend her.

After N.A. fled the store, the clerk noticed L.A. and Frost "reaching over the front counter[,] . . . taking vape product and lighters." CP at 2. In an effort to stop her, the clerk grabbed both Frost and L.A. by their hair. Both women began kicking and punching the clerk. Frost continued "to reach over the counter" and stuff the stolen product "in her pink coat pockets." CP at 3. The other patron rushed over, attempting to assist in detaining Frost. Frost shoved the other patron and threw a plastic trash can at the clerk. Then, Frost took the plastic lid off the trash can and hit the clerk, causing it to break. Frost proceeded to tip over a "Red Bull display case" and exit the store. CP at 3. Afterward, the clerk pulled L.A. behind the counter and called 911.

Officer Spithaler arrived on the scene around 2:27 a.m. Spithaler was approached by L.A. and Frost. L.A., in distress, told Spithaler, "I just tried to rob that store." CP at 1. Before Spithaler had the opportunity to talk with Frost, she fled. L.A. was placed under arrest. Police tracked down N.A., who was then "referred to the Thurston County Prosecutor's Office for [a] review of charges." CP at 3. The clerk did not sustain any injuries, and the other patron had a 6 inch laceration on his neck.

On March 8, 2023, Spithaler "was dispatched . . . for a reported suspicious person." CP at 3. Spithaler found Frost in a wooded area behind a parking lot. Spithaler ultimately took Frost into custody, advising that she was under investigation for a recent robbery. After being read her *Miranda*[1] rights, Frost voluntarily acknowledged involvement in the robbery. Frost stated, "I didn't steal anything," and "he [(presumably Hoffman)] assaulted me first." CP at 3. Frost was

---

[1] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

2

transported to the Thurston County jail, and subsequently charged with robbery in the second degree in violation of RCW 9A.25.210.

## II.    SENTENCING

Pursuant to *In re Pers. Restraint of Barr*, 102 Wn.2d 265, 684 P.2d 712 (1984), Frost pleaded guilty to assault in the third degree (count 1) and theft in the third degree (count 2).  With no criminal history, Frost's offender score was zero.  The standard sentencing range for assault in the third degree was 1 to 3 months.  The standard sentencing range for theft in the third degree was 0 to 364 days.

At the sentencing hearing, the State advocated for 3 months of confinement for count 1, the high end of the standard sentencing range.  Defense counsel acknowledged the plea agreement, but suggested the 3-month sentence was unfair because Frost suffered from catatonia[2] and was susceptible to bad influence.  After the State threatened to withdraw the plea and proceed with the original charges, defense counsel clarified it was not challenging the agreement.

Throughout the hearing, the court inquired into several aspects of the case.  The court first questioned the State regarding the outcome of the other individuals involved in the incident.  Failing to accurately report the outcomes of Frost's accomplices, the State explained that L.A. and N.A. fled, "were not arrested," and were not able to be found.  Rep. of Proc. (RP) at 8.[3]  The court

---

[2] "'Catatonia is a disorder that disrupts how your brain works, disrupting how a person processes and reacts to the world around them.  People with catatonia often don't react to things happening nearby or may react in ways that seem unusual.  Impaired communication, unusual movements or lack of movement, and behavior abnormalities are the most striking feature of the condition.'"  Br. of Resp't at 3 n.1 (quoting *Catatonia*, CLEVELAND CLINIC, https://my.clevelandclinic.org/health/diseases/23503-catatonia (last visited Nov. 7, 2024).

[3] Both the original and amended information did not list any co-defendants for the case.  The affidavit for probable cause, however, clearly stated that L.A. was detained and N.A. was referred to the Thurston County Prosecutor's office for an evaluation of charges.

3

then asked whether a weapon was used. The State replied, "No. They came in just with fists." RP at 11.

The court imposed an exceptional downward sentence of no time in confinement and one year of community custody for assault in the third degree. For theft in the third degree, the court imposed ninety days in confinement, suspended all ninety days, and required Frost to continue with mental health treatment. In its written ruling, the court based its decision on three factors: (1) the "others involved not being held accountable," (2) there was "no weapon[] . . . involved," and (3) the defendant had no criminal history. CP at 34. Throughout its oral ruling, the court referenced all three factors, highlighting that Frost accepted responsibility for her actions and achieved stability after getting mental health treatment.

The State appeals the exceptional downward sentence.

ANALYSIS

THE TRIAL COURT ERRED IN IMPOSING AN EXCEPTIONAL DOWNWARD SENTENCE.

The State argues the court based the exceptional downward sentence on impermissible mitigating factors. We agree.

The Sentencing Reform Act of 1981 (SRA) was enacted with the intent "to make the criminal justice system accountable to the public," RCW 9.94A.010, and decrease the impact of racism and favoritism at sentencing, *see State v. Thomason*, 199 Wn.2d 780, 792-95, 512 P.3d 882 (2022) (Gonzales, C.J., concurring). The SRA sought to achieve this "by developing a system for the sentencing of felony offenders which structures, but does not eliminate discretionary decisions affecting sentences." RCW 9.94A.010.

4

A.      Standard of Review

Generally, courts must impose a sentence within the standard range.  *State v. Alexander*, 125 Wn.2d 717, 722, 888 P.2d 1169 (1995); RCW 9.94A.535.  A court, however, may impose an exceptional sentence outside the standard range if it concludes that "there are substantial and compelling reasons justifying an exceptional sentence."  RCW 9.94A.535.  We may reverse a sentence outside the standard sentence range only if we conclude:

> Either that the reasons supplied by the sentencing court are not supported by the record which was before the judge or that those reasons do not justify a sentence outside the standard sentence range for that offense; or (b) that the sentence imposed was clearly excessive or clearly too lenient.

RCW 9.94A.585(4).

Courts "have construed [RCW 9.94A.585(4)] to establish three prongs, each with its own corresponding standard of review."  *State v. Law*, 154 Wn.2d 85, 93, 110 P.3d 717 (2005).  In analyzing "'the appropriateness of an exceptional sentence,'" we first evaluate if "'the reasons given by the sentencing judge are supported by evidence in the record,'" which is reviewed under the clearly erroneous standard.  *Id.* (quoting *State v. Ha'mim*, 132 Wn.2d 834, 840, 940 P.2d 633 (1997), *abrogated on other grounds by State v. O'Dell*, 183 Wn.2d 680, 358 P.3d 359 (2015)).  Under this standard, we reverse "'only if no substantial evidence supports [the court's] conclusion.'"  *State v. Jeannotte*, 133 Wn.2d 847, 856, 947 P.2d 1192 (1997) (quoting *State v. Grewe*, 117 Wn.2d 211, 218, 813 P.2d 1238 (1991)).  Substantial evidence is "'evidence in sufficient quantum to persuade a fair-minded person of the truth of the declared premises.'"  *Jeannotte*, 133 Wn.2d at 856 (internal quotation marks omitted) (quoting *Olmstead v. Dep't of Health*, 61 Wn. App. 888, 893, 812 P.2d 527 (1991)).  Next, we ask whether the "'reasons justify a departure from the standard range,'" which is a matter of law reviewed de novo.  *Law*, 154 Wn.2d at 93 (quoting *Ha'mim*, 132 Wn.2d at 840).  Finally, we determine if "'the sentence [is] clearly too

excessive or too lenient,'" which is reviewed for an abuse of discretion. *Law*, 154 Wn.2d at 93 (quoting *Ha'mim*, 132 Wn.2d at 840).

### B. Legal Principles

The SRA "provides a nonexclusive list of mitigating circumstances . . . support[ing] an exceptional sentence below the [standard] range." *Thomason*, 199 Wn.2d at 788. Generally, "mitigating factors 'must relate to the crime and make it more, or less, egregious.'" *Law*, 154 Wn.2d at 98 (quoting *State v. Fowler*, 145 Wn.2d 400, 404, 38 P.3d 335 (2002)). To determine whether a non-statutory mitigating factor is proper, courts apply a two-part test articulated in *Grewe*, 117 Wn.2d 211. First, we must determine whether the mitigating factor was "considered by the [l]egislature in establishing the standard sentence range." *Id.* at 215-16. Second, the mitigating factor "must be sufficiently substantial and compelling to distinguish the crime in question from others in the same category." *Id.* at 216.

There are several factors that may not be considered when imposing an exceptional sentence. For example, a court may not rely on the defendant's criminal history, *see, e.g.*, *State v. Pascal*, 108 Wn.2d 125, 137, 736 P.2d 1065 (1987), or the purposes of the SRA, *Alexander*, 125 Wn.2d at 730 n.22, because these are already taken into consideration by the legislature when establishing the standard range for an offense. "An exceptional sentence may be upheld on appeal even where all but one of the . . . court's reasons for the sentence have been overturned." *State v. Gaines*, 122 Wn.2d 502, 512, 859 P.2d 36 (1993). Remand is necessary, however, "where it is not clear whether the . . . court would have imposed an exceptional sentence on the basis of only the one factor upheld." *Id.*

C.    Accountability of Others

The State argues that the court erred in basing an exceptional sentence on L.A. and N.A. not being held accountable. We agree.

Even if this factor were supported by sufficient evidence, it cannot justify an exceptional sentence. Here, the "accountability of others" factor is akin to the policy purpose of proportionality underlying the SRA. Br. of Appellant at 13; RCW 9.94A.010(3) ("The purpose of this chapter is to . . . [b]e commensurate with the punishment imposed on others committing similar offenses."). As our Supreme Court in *Alexander* explained, the purposes of the SRA alone cannot justify an exceptional sentence because they are not mitigating factors in and of themselves. 125 Wn.2d at 730 n.22. Therefore, we conclude the accountability of others is an impermissible basis for an exceptional sentence.[4, 5]

D.    Absence of a Weapon

The State also argues that the court erred in basing an exceptional sentence on the absence of a weapon. We agree.

---

[4] In relation to this factor, Frost references the court's reliance on RCW 9.94A.535(1)(c)-(e). The court, however, did not include these mitigating factors in its written ruling. "Washington is a written order state." *State v. Huckins*, 5 Wn. App. 2d 457, 469, 426 P.3d 797, 804 (2018). A "court's oral statements are 'no more than a verbal expression of [its] informal opinion at that time . . . . necessarily subject to further study and consideration, and may be altered, modified, or completely abandoned.'" *Id. at* 469-70 (internal quotation marks omitted) (quoting *State v. Dailey*, 93 Wn.2d 454, 458, 610 P.2d 357 (1980)). Our use of a court's oral ruling is limited to interpreting an *ambiguous* written ruling; when a court's written ruling is unambiguous, we do not consider the court's oral ruling. *See In re Dep. of C.M.*, 118 Wn. App. 643, 650, 78 P.3d 191 (2003). The court's written ruling here is unambiguous.

[5] Frost relies on *State v. Statler*, 160 Wn. App. 622, 248 P.3d 165 (2011), a Division Three case, for the proposition that severity of sentence compared to co-defendants can be a factor considered by a court in upholding an exceptional sentence. But *Statler* also considered a number of other factors in upholding the exceptional sentence. *Id.* at 639-40. Moreover, we are not bound by *Statler*. *See In re Pers. Restraint of Arnold*, 190 Wn.2d 136, 148-49, 410 P.3d 1113 (2018).

This factor is supported by the record. The affidavit for probable cause made no mention of a weapon being used, which was confirmed by the State at the sentencing hearing.

Nonetheless, this factor is an improper basis for an exceptional downward sentence. The parties disagree on whether the absence of a weapon should be evaluated through robbery in the second degree or assault in the third degree. We agree with the State that the analysis would necessarily focus on robbery in the second degree.

When a defendant pleads guilty under *Barr*, as Frost did here, they "plead to a related lesser charge that *was not committed* in order to avoid certain conviction for a greater offense." 102 Wn.2d at 270 (emphasis added). In doing so, a defendant takes "advantage of a plea offer without having to admit that his or her conduct satisfies the elements of the charged crime." *State v. Zhao*, 157 Wn.2d 188, 199-200, 137 P.3d 835 (2006). Consequently, the lesser offense is a legal fiction. *See Barr*, 102 Wn.2d at 269-70; *Zhao*, 157 Wn.2d at 199. This approach has its benefits as it enables the parties to target an agreeable standard range, allowing the State to resolve a case with a plea bargain instead of trial, and the defendant avoids exposure to a higher standard range or other collateral consequences associated with the greater charge. *See Barr*, 102 Wn.2d at 267-68, 270.

Adopting Frost's argument would lead to absurd results because there is never a factual basis for the offense a defendant pleads to under *Barr*. *See* 102 Wn.2d at 269-70; *Zhao*, 157 Wn.2d at 199. As a result, the offense the defendant pleads guilty to would always be distinguishable from what the legislature considered when establishing the standard range for the crime, *Grewe*, 117 Wn.2d at 215-16, and every *Barr* plea would be subject to an exceptional sentence, either downward or upward. This uncertainty can be an unanticipated deterrent or incentive to utilizing a *Barr* plea and militates against adopting Frost's reasoning.

8

Even so, Frost's argument is unavailing because the legislature contemplated the absence of a weapon in both offenses. For robbery, the use of a weapon results in the offense qualifying as robbery in the first degree, not second degree; clearly, the legislature's standard range sentence for robbery in the second degree contemplates the absence of a weapon in the commission of that crime. *Compare* RCW 9A.56.190 and RCW 9A.56.210 *with* RCW 9A.56.200. But assuming without deciding that we are to look at the lesser crime, here assault in the third degree, the broadly defined scope of assault in the third degree also contemplates the absence of a weapon. RCW 9A.36.031(1)(d) ("[w]ith criminal negligence, causes bodily harm to another person by means of a weapon *or other instrument or thing likely to produce bodily harm*") (emphasis added). As is evident, the legislature considered the absence of a weapon in the commission of both robbery in the second degree and assault in the third degree. Frost's argument fails. As a result, the factor does not pass the first step of the *Grewe* analysis.

Therefore, the court erred in basing an exceptional sentence on the absence of a weapon.

E.      Criminal History

Finally, the State argues that the court erred in basing an exceptional sentence on Frost's lack of criminal history. We agree.

While this factor is supported by the record,[6] it was also an improper basis for an exceptional sentence. Our Supreme Court has clearly stated that a sentencing court may not properly consider the defendant's criminal history when imposing an exceptional sentence. *Pascal*, 108 Wn.2d at 137; *State v. Freitag*, 127 Wn.2d 141, 144, 896 P.2d 1254, 905 P.2d 355 (1995); *Fowler*, 145 Wn.2d at 405. This is so because a defendant's criminal history "is one of the components used to compute the presumptive range for an offense under the [SRA]". *Pascal*,

---

[6] The record clearly supports that Frost has no criminal history.

9

108 Wn.2d at 137. As a result, this factor fails at the first step of the *Grewe* analysis because it has already been considered by the legislature.

Therefore, it was improper for the trial court to base an exceptional downward sentence based on Frost's lack of criminal history.

CONCLUSION

Accordingly, none of the factors relied on by the trial court justified an exceptional downward sentence.[7] Therefore, we reverse the sentence and remand for resentencing.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Veljacic, A.C.J.

We concur:

Lee, J.

Glasgow, J.

---

[7] Because none of the factors justified an exceptional sentence, we need not reach the State's second argument that the sentence was too lenient.