# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 59200-2-II |
| Respondent, | |
| v. | |
| JOESEPH REGINALD LAURSEN, | UNPUBLISHED OPINION |
| Appellant. | |

CRUSER, C.J.—In November 2019, Shaun Moore moved into a studio apartment with Jade Laursen[1] and 5 other individuals. Moore and Laursen began a romantic relationship. However, Moore also engaged in sexual intercourse with another member of the household and this behavior upset the rest of the group living in the apartment. As a result, Laursen and the other household members assaulted, falsely imprisoned, and deprived Moore of food over the course of the next 10 months until his death in August 2020. After Moore's death, Laursen concealed Moore's body in the apartment bathroom for 2 weeks before disposing the body near railroad tracks. In September 2020, police found Moore's body and arrested Laursen and the 5 other people residing in the apartment at the time. Laursen pleaded guilty to second degree murder, first degree criminal mistreatment, second degree assault, and unlawful imprisonment. The State recommended a

---

[1] Mx. Laursen is gender non-binary and uses gender-neutral plural pronouns (they/them). Their chosen name is "Jade." This opinion will refer to them by their chosen name and pronouns, and using the gender-neutral honorific "Mx."

sentence of 200 months and Laursen requested an exceptional sentence of 120 months under RCW 9.94A.535(1)(e), arguing that their cognition, mental illness, and experience of childhood abuse significantly impaired their capacity to appreciate the wrongfulness of their conduct. The court imposed a high-end standard sentence of 265 months of confinement.

Laursen appeals to this court, arguing that the trial court erred in concluding that Laursen failed to demonstrate, by a preponderance of the evidence, that their capacity to appreciate the wrongfulness of their conduct was significantly impaired. Laursen argues that the trial court did not properly consider the evidence because it did not assign enough weight to evidence of Laursen's cognition, mental health, and experience of childhood abuse. Further, Laursen argues that the court erred in relying on evidence of Laursen's attempts to negotiate with law enforcement during an interview, Laursen's ability to seek "help when they were the victim of assault" as a child, and Laursen's significant role in the crimes. Verbatim Rep. of Proc. (VRP) (July 19, 2023) at 88. In response, the State maintains that the trial court did not abuse its discretion in sentencing Laursen to 265 months of confinement. The State argues that the trial court properly considered Laursen's request and that this court should not reweigh the evidence on review. We agree with the State and affirm Laursen's sentence.

FACTS

I. BACKGROUND

In November 2019, Shaun Moore was released from a drug and alcohol rehabilitation center and seeking a place to live. At the time, Jade Laursen was 26 years old and living in a studio apartment with five other individuals: BillyJo Richardson and her daughter, Helen Richardson,[2]

---

[2] We refer to BillyJo Richardson and Helen Richardson by their first names to avoid confusion.

Ashleigh Butsch, Kyle Jarstad, and Jon Carroway. Laursen referred to this group as their " 'chosen family.' " Clerk's Papers (CP) at 169. The residents of the apartment agreed by vote to let Moore move into the apartment with them. Butsch knew Moore from Moore's time at the drug and alcohol rehabilitation center. Moore was Helen's ex-boyfriend and the father of her child. However, neither Helen, nor Helen's mother, BillyJo, were happy with the group's decision to let Moore move in.

While living together, Moore and Laursen began a romantic relationship, but Moore also engaged in sexual intercourse with Helen. Over time, the residents of the apartment grew increasingly upset with Moore for various reasons. For example, Helen became upset after Moore told her that he never loved her, despite their past relationship. Butsch, and her boyfriend Jarstad, grew upset because Moore " 'oogled' " at Butsch. *Id.* at 324. Finally, Carroway, who was Helen's boyfriend at the time, disliked Moore because of his past relationship with Helen. As a result of the increasing agitation and tension between Moore and the other members of the household, the residents began abusing Moore and continued to do so over the course of several months until his death.

All residents of the apartment admitted to assaulting Moore, but the other residents considered Laursen to be the "head honcho" and "de facto leader of the whole family." *Id.* at 441, 793. According to the other residents, Laursen played a significant role in Moore's abuse and death. According to Helen and Butsch, Laursen commanded others to hit Moore. Jarstad said that Laursen was the one who initiated hitting Moore and it was always Laursen who "prompted [Jarstad to get] involved." *Id.* at 844. On multiple occasions, the group forced Moore to stand facing the wall for hours at a time. According to Jarstad, "[Laursen's] idea of telling [Moore] to

stand at the wall" led all residents in the apartment to tell Moore to stand at the wall while they used the restroom. *Id.* at 832.

According to other members of the group, Laursen controlled Moore's behavior in a number of ways. Butsch stated that Moore needed permission from Laursen to "smoke weed" or "have cigarettes." *Id.* at 715. Laursen also controlled when Moore left the apartment. According to Butsch, "[Laursen] wouldn't let [Moore] out of [their] sight" and would put someone in charge of watching Moore whenever they used the bathroom. *Id.* at 731. Helen described an occasion where Moore tried to escape the apartment but Helen closed the door before he could get out and then Laursen came in and "started beating him up." *Id.* at 489. Laursen also withheld food from Moore, causing Moore to lose a significant amount of weight. For example, Jarstad said that Laursen "would not allow [Moore] to have any sort of food unless [Laursen] approved it." *Id.* at 855. BillyJo said that she overheard Laursen tell Moore that he could not have food. Butsch testified that Laursen said to the group " 'If I catch you feeding [Moore], you have to answer to me.' " *Id.* at 753.

Months of abuse and control left Moore dangerously weak. Moore lost so much weight that he needed to use a drawstring to keep his sweatpants up. Residents of the apartment described Moore as " 'skeletal,' " "malnourished," and "looking like one of those emaciated dogs you see off of those animal cruelty TV shows." *Id.* at 12, 749, 872. According to Butsch, Laursen told Moore to keep his head from resting on his shoulder, but Moore did not have the strength to comply. Butsch stated that Moore's failure to comply angered Jarstad, leading him to punch Moore in the head. Jarstad's punch knocked Moore unconscious, and Moore died shortly after. The

medical examiner determined that Moore died of homicide, as a result of multiple blunt force injuries of the head and torso.

After Moore died, Laursen and Carroway moved Moore's body into the shower in the apartment, where the body remained for approximately two weeks. When Moore's foster parent messaged Helen asking where Moore was, Helen said that Laursen "came up with the plan to say that [Moore] went out traveling and we hadn't heard from him." *Id.* at 565. While the body was still in the apartment, neighbors complained about a smell emanating from the unit. Finally, after receiving notice for an apartment inspection, Carroway and Laursen moved Moore's body from the apartment to the nearby railroad tracks.

In September 2020, police found Moore's remains near the railroad tracks. By mid-December, police identified the apartment as Moore's last known address and obtained a search warrant to enter the apartment. According to BillyJo, after detectives questioned the group, Laursen said to the group, "You should have expected this to happen[,]" as if Moore's death was planned. *Id.* at 620.

## II. PROCEDURAL HISTORY

The State amended the charges against Laursen multiple times, ultimately charging Laursen with second degree murder, first degree criminal mistreatment, second degree assault, and unlawful imprisonment. Before the State filed the final charges, the trial court held a CrR 3.5 hearing to determine whether Laursen's statements during interviews with police were made involuntarily in violation of Laursen's Fifth Amendment rights. After the hearing, the court excluded all of Laursen's statements during interviews with police from trial because the police obtained those statements in violation of Laursen's Fifth Amendment rights.

In June 2023, Laursen negotiated a plea agreement with the State in which they pleaded guilty to second degree murder, first degree criminal mistreatment, second degree assault, and unlawful imprisonment. In the plea bargain, Laursen made the following statements:

> Between November 1, 2019 through September 15th, 2020, I lived with Shaun Moore and others in an apartment. I, and others, intentionally assaulted Shaun and recklessly inflicted substantial bodily harm by hitting him with our hands and other objects (Assault 2). These felony assaults caused Shaun Moore's death (Murder 2). I, and others, also recklessly caused great bodily harm to Shaun Moore by withholding the basic necessities of life such by not giving Shaun food (Criminal Mistreatment 1). I, and others, also knowingly restricted Shaun Moore's movements without consent or legal authority in a manner that interfered with Shaun's liberty by not letting him leave the apartment (Unlawful Imprisonment).

*Id.* at 301.

At sentencing, the trial court determined that the standard range sentence on Laursen's most serious offense (second degree murder) was 165 to 265 months. Pursuant to its agreement with Laursen, the State recommended a sentence of 200 months.

Due to Laursen's history of abuse and mental illness, Laursen asked the court to impose a sentence of 120 months as an exceptional sentence below the standard range under RCW 9.94A.535(1)(e). Laursen argued that they were unable to appreciate the wrongfulness of their conduct or conform their conduct to the requirements of the law. In support of this argument, Laursen presented a psychological evaluation to the trial court, which identified their history of abuse, mildly impaired intellectual ability, and mental illness. The psychological evaluation indicated that as a child, they experienced an unstable living arrangement and abuse. Laursen's father was rarely present during their upbringing and Laursen was frequently in foster care due to their mother's use of methamphetamine and alcohol, and physical abuse. Laursen's brother also physically abused Laursen on occasion. At times, Laursen lived with their grandmother, who was

6

physically and sexually abusive. On multiple occasions, after experiencing assault, Laursen sought help from a neighbor or police officer.

The psychological evaluation also indicated that Laursen's overall intellectual ability was "borderline with mildly impaired functioning." *Id.* at 350. The evaluation also showed that Laursen suffered from mental health conditions, including "depression, anxiety, and post-traumatic stress disorder [PTSD]." *Id.* at 349. The evaluation stated that Laursen heard "about six voices that talk to one another," engaged in self-harm, attempted suicide multiple times, and reported having a seizure in 2014. *Id.*

The trial court imposed a sentence of 265 months of confinement, which is at the high end of the standard range. In doing so, the trial court considered whether Laursen's history of childhood abuse, cognitive abilities, and mental health conditions qualified Laursen for an exceptional downward sentence. The trial court stated that Laursen's argument for an exceptional sentence was based on their low IQ score, childhood trauma, adverse childhood experiences, substance abuse, and mental health problems, including PTSD and poor executive functioning. The trial court stated:

> Mx Laursen argues that the capacity to appreciate the wrongfulness of the crimes are attributed to a number of things including limited cognition represented by a low IQ with Dr. Patterson indicating in an earlier hearing that it was borderline. Mx Laursen describes and Dr. Milner describes childhood trauma and that Mx Laursen experienced seven of ten adverse childhood experiences and that the literature suggests that even with lower numbers of what are referred to as ACEs, the adverse childhood experiences, that toxic stress throughout a person's childhood can impact their decision[-]making or the development of their decision[-]making skills.
> Mx Laursen points to mental health diagnoses including PTSD diagnosis, long history of drug abuse, arguing that that impacts brain development.

VRP (July 19, 2023) at 82-83.

The trial court was not persuaded, however, that Laursen's childhood abuse, cognitive inability, and mental health conditions demonstrated that Laursen was unable to appreciate the wrongfulness of their conduct. The trial court said:

> There is no doubt in this court's mind that the information presented by the defense regarding childhood trauma and the adverse childhood experiences occurred, that this was tragic and that they clearly impacted Mx Laursen's development and . . . that did not result in having a strong sense of morals and law-abiding behaviors. Mx Laursen's IQ, age, mental health diagnosis and substance abuse also likely contributed to their ability to fully appreciate the gravity of the crimes and the actions and likely consequences of the individual events at the apartment. However, that does not establish by a preponderance of the evidence that . . . their capacity to appreciate the wrongfulness was significantly impaired.

*Id.* at 87.

In addition, the court noted that Laursen understood the wrongfulness of their actions because they attempted to negotiate with law enforcement during an interview, sought "help when they were the victim of assault" as a child, and played a significant role in the crimes. *Id.* at 88. The court explained:

> [S]ome of the evidence from a 3.5 hearing that the court had the opportunity to consider informs the court's assessment of Mx Laursen's capacity to appreciate wrongfulness. I observed audio/video from December of 2020 a few months after the events described culminated in Shaun's death. I heard the opinion of Dr. Patterson regarding Mx Laursen's cognitive abilities, and I observed Mx Laursen's actions and words and demeanor including attempts at negotiations throughout the interview. Those observations and that evidence suggests a cognitive functioning that understood decision[-]making and was able to make decisions and an appreciation for legal principles. In addition, the record that was provided both by Mx Laursen and by the state does show that amidst the tragic history of their youth that Mx Laursen appreciated and acted upon reaching out and seeking help when they were the victim of assault as a young person.
> Ultimately, the nature of the crimes that were pled to and the statement of facts from Mx Laursen, elaborated on by multiple statements by the other five individuals who were present over ten months in an apartment where torture of Shaun Moore occurred, described that over ten months there were assaults on Shaun, there was withholding of food and water, Shaun was prevented from

leaving, and ultimately Shaun lost a substantial amount of weight and died. This occurred in a very small studio apartment.

*Id.* at 88-89.

Finally, the trial court indicated that it exercised discretion in imposing Laursen's sentence. After considering the arguments and reviewing the evidence and relevant law, the court stated, "I am exercising discretion, but I'm declining to impose an exceptional downward sentence." *Id.* at 89. According to the court, "[t]here [was] not substantial and compelling circumstances supported by a preponderance that Mx[.] Laursen's capacity to appreciate wrongfulness of the crimes was significantly impaired." *Id.* at 90.

ANALYSIS

Laursen argues that the trial court erred in concluding that Laursen failed to establish by a preponderance of the evidence that they lacked the capacity to appreciate the wrongfulness of their conduct. Laursen argues that they "presented ample evidence that their troubled childhood, long history of abuse, and cognitive abilities left them unable to appreciate the wrongfulness of their conduct, . . . but the court misunderstood the law and did not properly consider this evidence." Br. of Appellant at 14 (emphasis omitted). Laursen also argues that the trial court erred in relying on evidence of Laursen's attempts to negotiate with law enforcement during an interview, Laursen's ability to seek "help when they were the victim of assault" as a child, and Laursen's significant role in the crimes. VRP (July 19, 2023) at 88.

In response, the State maintains that the trial court did not abuse its discretion in sentencing Laursen to 265 months of confinement. The State argues that the trial court properly considered Laursen's request and we should not reweigh evidence on review. We agree with the State.

I. LEGAL PRINCIPLES

We review a trial court's decision to impose an exceptional sentence for abuse of discretion. *State v. Grayson*, 154 Wn.2d 333, 342, 111 P.3d 1183 (2005). "A trial court abuses its discretion when its decision is 'manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons.' " *State v. Martinez*, 2 Wn.3d 675, 681, 541 P.3d 970 (2024) (internal quotation marks omitted) (quoting *State v. Barry*, 184 Wn. App. 790, 802, 339 P.3d 200 (2014)). In addition, "[a] trial court abuses its discretion if it 'relies on unsupported facts, takes a view that no reasonable person would take, applies the wrong legal standard, or bases its ruling on an erroneous view of the law.' " *Id.* at 687 (quoting *Gildon v. Simon Prop. Grp., Inc.*, 158 Wn.2d 483, 494, 145 P.3d 1196 (2006)). An appellate court cannot reweigh the evidence on appeal. *State v. Backstrom*, 15 Wn. App. 2d 103, 106, 476 P.3d 201 (2020); *Ramos*, 187 Wn.2d 420, 453, 387 P.3d 650 (2017).

The trial court "may impose an exceptional sentence below the standard range" if the defendant establishes, by a preponderance of the evidence, that mitigating circumstances exist. RCW 9.94A.535(1); *see Ramos*, 187 Wn.2d at 434. One of the mitigating circumstances for courts to consider is whether "[t]he defendant's capacity to appreciate the wrongfulness of [their] conduct, or to conform [their] conduct to the requirements of the law, was significantly impaired." RCW 9.94A.535(1)(e). Courts in Washington rarely grant an exceptional sentence under RCW 9.94A.535(1)(e). *See, e.g., State v. Allert*, 117 Wn.2d 156, 170, 815 P.2d 752 (1991) (determining the defendant's alcoholism did not require an exceptional sentence); *State v. Rogers*, 112 Wn.2d 180, 185, 770 P.2d 180 (1989) (holding that impaired judgment and irrational thinking did not warrant an exceptional sentence); *State v. Schloredt*, 97 Wn. App. 789, 803, 987 P.2d 647 (1999) (concluding that depressive disorder with psychotic features did not warrant an exceptional

sentence). *But see, e.g., State v. Pascal*, 108 Wn.2d 125, 136, 736 P.2d 1065 (1987) (holding trial court was justified in relying in part on RCW 9.94A.535(1)(e) to impose an exceptional sentence when the victim physically and emotionally abused the defendant the day of the incident).

## II. APPLICATION

Laursen argues that the trial court erred in not finding the evidence presented by Laursen to be persuasive and by improperly weighing the evidence. Laursen argues that while extensive evidence warranted a mitigated sentence, the trial court did not properly consider the evidence.

As the State correctly observes, Laursen's arguments would require us to reweigh evidence, which we cannot do. *Backstrom*, 15 Wn. App. 2d at 106. The trial court's review of the evidence in Laursen's case is similar to the trial court's careful review of the record in *Backstrom*. In *Backstrom*, the court held that the trial court did not abuse its discretion because it "carefully reviewed and weighed the mitigating evidence." *Id.* at 109. In *Backstrom*, the *Miller*-fix statute required the trial court to weigh the defendant's youth, life experiences prior to the crime, capacity for exercising responsibility, and evidence of rehabilitation after the crime. *Id.* at 108-09. Accordingly, the trial court in *Backstrom* discussed the defendant's youth, a lifestyle that " 'clearly illustrated that he had very poor decision-making abilities and very poor judgment,' " " 'environmental and family circumstances,' " and rehabilitation considering his " 'success in prison.' " *Id.* at 108.

Similar to the court in *Backstrom*, the trial court here weighed the evidence related to the relevant mitigating circumstances. To determine whether Laursen established that their "capacity to appreciate the wrongfulness of [their] conduct . . . was significantly impaired," the trial court weighed evidence of Laursen's childhood abuse, cognitive inability, mental health conditions,

negotiations with law enforcement, and role in the crime. RCW 9.94A.535(1)(e). The trial court stated its belief that Laursen's childhood trauma, adverse childhood experiences, IQ, age, mental health diagnosis, and substance abuse affected "their ability to fully appreciate the gravity of the crimes." VRP (July 19, 2023) at 87. The court also weighed evidence of Laursen's attempts to negotiate with law enforcement during police interviews, aims to seek "help when they were the victim of assault" as a child, and significant role in Moore's abuse. *Id.* at 88. Weighing all of these case-specific facts, the trial court concluded that the evidence did "not establish by a preponderance of the evidence that . . . [Laursen's] capacity to appreciate the wrongfulness was significantly impaired." *Id.* at 87. Therefore, the trial court properly weighed the evidence and we cannot reweigh the evidence on review.

Likewise, the trial court did not err in considering evidence that Laursen was capable of appreciating the wrongfulness of assault based on their own history of reporting assaults against them to law enforcement in their childhood, nor did the trial court err in considering evidence of Laursen's attempt at negotiating their case with law enforcement. Here again, Laursen's argument boils down to their disagreement with the decision the trial court reached after considering all of the evidence presented. We do not reweigh evidence, and we do not substitute our judgment for that of the trial court. Laursen's attempt to frame this as a *legal error* by the trial court in failing to properly weigh the evidence is unavailing. Laursen bore the burden, not just of production, but

of persuasion. *See* RCW 9.94A.535; *see also Ramos*, 187 Wn.2d at 434. As to the latter, Laursen

failed to persuade the trial court that an exceptional sentence was warranted. We find no error.[3]

CONCLUSION

The trial court's reasoning and discussions at sentencing demonstrate that the court

properly weighed the evidence of Laursen's childhood abuse, cognitive inability, mental health

conditions, negotiations with law enforcement, and role in the crime. Therefore, the trial court did

not abuse its discretion. Accordingly, we hold that the trial court did not abuse its discretion in

refusing to grant Laursen's request and in imposing a sentence of 265 months of confinement. We

affirm.

A majority of the panel having determined that this opinion will not be printed in the

Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040,

it is so ordered.

_____
CRUSER, C.J.

We concur:

_____
VELJACIC, J.

_____
PRICE, J.

---

[3] To the extent Laursen suggests it was error for the trial court to consider their attempts at negotiation with law enforcement during their police interview, Laursen simply argues that doing so was "illogical," and points us to no authority suggesting this is error. Br. of Appellant at 20. *State v. Johnson*, 119 Wn.2d 167, 171, 829 P.2d 1082 (1992) (the appellate court will not review an issue raised in passing or unsupported by authority or persuasive argument).